INTERNATIONAL POCKETBOOK WORKERS' UNION et al. *v.* HARRY ORLOVE et al.

INTERNATIONAL POCKETBOOK WORKERS' UNION et al. *v.* MICHAEL J. FOX et al.

SAM MELNIKOFF et al. *v.* HARRY ORLOVE et al.

B. BARKE et al. *v.* MICHAEL J. FOX et al.

[Nos. 83, 84, 85, 86, October Term, 1929.]

*Decided February 12th, 1930.*

The cause was argued before Bond, C. J., Pattison, Urner, Offutt, Parke, and Sloan, JJ.

*Ellis Levin* and *Robert F. Leach, Jr.,* for the appellants.

*Randolph Barton, Jr.,* and *E. Milton Altfeld,* with whom were *F. Fulton Bramble* on the brief, for the appellees.

Bond, C. J., delivered the opinion of the Court.

These appeals by a labor union and employees of the appellees, engaged in a strike to bring about the organization of a union in their trade in Baltimore, are taken from decrees enjoining some activities in the prosecution of the strike, and from orders adjudging the defendants to have been guilty of contempt in exceeding the limits imposed by a similar injunction issued at a preliminary stage in the contest. The firm of Orlove & Schwartz, and Fox, trading as M. J. Fox & Company, maintain in Baltimore City establishments for the manufacture of pocketbooks and bags. They have had open shops, employing workers without regard to their connection or lack of connection with a union, and dealing with each singly. Each shop occupies an upper floor of a building, and one employs about fifty-five workers, while the other employs a hundred. There are a few skilled workers, mostly men, used, and the larger portion of each force is made up of

unskilled girls and boys, from fourteen up to twenty and more years of age. All employees have been paid weekly, except that discharges have terminated employments during a week upon payment of wages for each day of work up to the times of discharges. The wages have run from $8 to as high as $40 a week, with overtime payments made, to some of the men, at least. There are few manufacturers at this work in Baltimore, only about two hundred persons being employed at it in the whole city. The larger part of the manufacturing is done in New York or nearby, but there are a few other factories in the northeastern part of the country. The chief labor union for this trade, appellant in two of these appeals, has its headquarters in New York City.

There is dispute as to the initiation of the effort to organize the union in Baltimore. The existing union in New York is suspected of having initiated it, for the obvious advantages to its members in having employees organized in all competing establishments. One of its representatives explained in the testimony the advantage to be gained in the ability to defend high wages paid and the Saturday half holiday allowed, in union shops, against the effect of underselling by manufacturers paying lower wages for longer hours. But the actual evidence in the case is that this move originated among the men workers in the Fox shop, late in the year 1928. Those workers, the testimony is, dissatisfied with their wages and hours and some of their working conditions —and there were some allegations of unreasonable discharges and a blacklist of discharged men to prevent employment elsewhere in the trade—began discussing the desirability of organizing a union, and at the dinner hour engaged in conversations with the men workers of the Orlove & Schwartz shop, and after a time arranged with a designer at the Fox shop, Vinclair, who had worked in New York, that he have a representative of the union in New York come help in the formation of a union here. Such is the direct testimony of the workers, and the appellee Fox testified that, in a talk early in the movement here, one of his workmen, David

Snyder, said that he, Snyder, had started the whole thing, and to some extent regretted it. Whether this evidence presents the whole story is unimportant, however, for in the view. taken by this court there would be no wrong in the mere fact of origination of the movement in New York rather than in Baltimore. As is conceded, there is a clear right in the workers to organize a union and secure collective bargaining if they can, and, so long as it is of their own free will, it is a matter of indifference whether they conclude to do so upon their own initiative or upon outside suggestion and persuasion. *Exchange Bakery and Restaurant, Inc., v. Rifkin,* 245 N. Y. 260, 263; *Stearns Lumber Co. v. Howlet,* 260 Mass. 45, 66.

The local union was formed so far as to be able to hold a first meeting in January of 1929. The meetings, and the discussions among workmen, were noticed by the employers, and they procured the names of workmen attending the meetings. Then each shop discharged a few of the union men, apparently, as this court reads the evidence, because of their activity in organizing the union. The two employers were, and remained throughout, firm in their decision to maintain open shops and not to bargain with a union, collectively.

Thereupon, during the month of February, a New York representative of the union, Shiplacoff, wrote a series of letters to each employer, asking for an interview, but these were not answered. At the instance of Shiplacoff, Rabbi Israel, of Baltimore, who is chairman of a commission of Jewish rabbis interested in industrial and social problems, had a conference with the employers, investigated the wages and conditions at the shops, and made recommendations for changes. The employers, however, maintained their position on the question of having to deal with a union of the workers, and at the end of February a strike was called, and a large portion of the workers stopped work within the next few days. So far as appears, those leaving at that time did so quite voluntarily, at least. Evidence of attempts of some

of them to persuade remaining employees to join them indicates much zeal on their part in the effort they were making. The existence of the strike, under the auspices of the New York and Baltimore unions, was advertised in newspapers; and, as a step in the preparations, the union managers arranged in advance for bail for striking employees who might be arrested. The New York union, furthermore, arranged to pay the striking employees during the strike their ordinary wages in full.

The strike was conducted quietly, with no public disturbances. And policemen detailed to watch over it reported nothing objectionable except that in a few instances striking employees on the sidewalks below the shops accosted some of those entering or coming from work. Pickets were employed. On the sidewalk below one place two men walked in opposite directions, passing and repassing, and at the other place four men walked similarly in pairs. They wore placards or banners, eighteen inches square, announcing the strike, at first with the additional statement that the employers were unfair to labor, but after the issue of the preliminary injunction merely announcing the strike under the auspices of the union. The statement was appended that the New York union was affiliated with the American Federation of Labor. There was testimony that placards or banners were required by the police department of the city to be carried by pickets, and that now and then pickets were warned by a policeman against walking without banners, but the exact requirement, and the purpose of it, were not explained, testimony on this having been excluded. The employers testified that the pickets tried to catch up with the workers on the street, that a greater number of employees than usual had lunch brought in to them while the place was picketed, and that at the closing hour the girls went home in bunches to a greater degree than usual. Efforts by pickets to come near enough to see packages being loaded on wagons were testified to. There was testimony of striking employees loitering on nearby corners, but not engaged

in picketing. And there was testimony, all contradicted, of scattered instances of threats by various employees on the strike to others remaining. Some of these instances, if true, seem unimportant; some seem strained in construction to bring them within the classes of strike activities which have been held wrong in cases elsewhere. But a few other activities testified to sound more serious. There is evidence, however, of merely peaceful persuasion of employees to join the strike, and the scattered instances of threatening do not appear sufficient to show a general purpose and method of coercion of employees.

During the progress of the strike, the employers advertised in Philadelphia for workers, and secured three men, who, after they went to work, cut and destroyed material given them. Supposed confessions of the men, stricken out of the evidence by the court as mere hearsay statements in this case, have nevertheless been inserted in the record by the appellees, but they cannot, of course, be considered on the appeal. The testimony contains denials of any implication of the present appellants in the actions of those men. It is admitted, however, that when the men were arrested in Baltimore, the union secured bail for them, and that counsel engaged by the union represented two of the men arrested.

The respective employers, on March 14th, and March 15th, 1929, filed bills of complaint against the two unions, the New York union and the Baltimore union, and their agents, and former employees directing the strike, and prayed that the defendants be enjoined from further interfering with the businesses of the plaintiffs, from threatening, intimidating, or interfering with the employees or their families, or with others who might desire to enter the employment, from injuring or destroying property or material, from unlawfully assembling, from maintaining pickets for the purpose of attempting to prevent, by intimidation, coercion, or threats, any person from working for the plaintiffs or entering their employ. And at the time of the filing of the bills, preliminary injunctions were issued in exact accordance with

these prayers, except that the carrying by the pickets of placards designed to create public prejudice against the plaintiffs was restrained in addition. Answers were filed denying the important averments of the complaints, motions to dissolve the injunctions were filed, and after a hearing the preliminary injunctions were modified slightly. On May 11th, 1929, petitions were filed alleging failure to comply with the terms of the injunctions, and praying that the defendants be required to show cause why they should not be attached for contempt of court. After a hearing of testimony on these petitions had been begun, the proceeding was by agreement of all concerned converted into a hearing on the whole case, on the two bills of complaint and answers, and on the petitions charging contempt of court, all in one proceeding. And after hearing all the evidence and the argument, the trial court signed decrees enjoining the defendants "from unlawfully interfering or causing any person or persons to interfere with the business of the plaintiffs, by threatening, intimidating or coercing the employees of the plaintiffs or any person who may desire to enter the plaintiff's employ, or any member of the family of any such employee or person who may desire to enter such employ; from injuring or destroying the property or materials belonging to the plaintiffs; from unlawfully assembling or causing persons to unlawfully assemble or unlawfully parade on the streets adjoining or in front of the property of the plaintiffs carrying placards designed to create public prejudice against the plaintiffs for the purpose of threatening, intimidating or coercing the employees of the plaintiffs, or for the purpose of preventing by intimidation, coercion or threats any person from working for the plaintiffs." This made permanent the injunctions as they had been issued preliminarily, with their modifications. And the Circuit Court, in addition, passed orders adjudging the individual defendants guilty of contempt of court in acts complained of in the conduct of the strike, but, in view of a disclaimer of any intentional violation of the previous injunctions, imposed no punishment for the contempt.

The defendants on their appeals urge that the orders adjudging them to be in contempt constitute proper subjects of appeal, notwithstanding the lack of any punishment imposed, because they adjudicate questions of right in the maintenance or conduct of the strike. But this we think incorrect. Settlement of any questions of right in such orders, over and above the findings of contempt, must be, in effect, injunctions restraining future conduct, for the cases are concerned only with such injunctions. But simultaneously with the signing of the orders, the preliminary injunctions and the orders, so far as they might have involved restraints for the future, or anything more than the findings of past contempts, were superseded and ended by the final decrees. And those decrees and the injunctions issued under them are the only rulings now open and subject to review, unless it can be held that the findings of past contempts are reviewable even though no punishments were imposed for them. And this, we think, cannot be held. There is no injury to be redressed. It is true that the Act of 1927, chapter 593, embodied in article 5, section 31, of the Code, has given a right of appeal "from an order remedial in its nature adjudging in contempt of court any party to a cause or any person not a party thereto (except orders passed requiring the payment of alimony)"; but we take it that this right of appeal, like rights given by the statutes, in similar unqualified terms, of appeal from other adjudications, supposes the existence of some injury from the orders to be redressed by appeal. The orders in the contempt proceedings are not, therefore, now subject to review on appeal. As the final injunctions in the cases are, however, identical in words with the preliminary injunctions which were being applied in these orders, the orders show possible interpretations and applications of the final decrees.

The injunctions decreed do not draw precisely the line of distinction between what the defendants may do and what they may not. And one of the objections of the appellants is that, in the prohibitions of unlawful activities in the respects mentioned, the injunctions are too indefinite to steer by, and

therefore defective as injunctions. *Singer v. James*, 130 Md. 382, 388; *New York etc. R. Co. v. Interstate Commerce Comm.*, 200 U. S. 361, 404. They might be read as prohibiting only activities of such nature or degree as are not defended in this case.

On behalf of the employers it is argued that the strike itself and the whole effort to organize a union of labor in these shops are unlawful because their original purposes are unlawful, and that therefore any acts in promotion of the strike are to be enjoined. But in this we have been unable to agree. And the injunctions appealed from need not be read as containing such sweeping comprehensive restraints as that theory demands. Broad and general as they are in terms, they do not enjoin the strike and any acts in its promotion, but enjoin acts of specified descriptions. In support of an argument that the whole effort made by the defendants is unlawful, and that therefore the injunctions cannot be held to be too broad and general, it was shown in evidence that in New York there has been in force an agreement between the employers and the defendant New York union in this trade, by the terms of which the employers have been left little or no control over the employment and discharge of workers in their shops, or over the terms of employment, cannot employ non-union men, and cannot deal with manufacturers with whom the union may have a dispute. And an agreement with a third Baltimore manufacturer containing a similar boycotting clause was admitted in evidence. This form of agreement is referred to as affording ground for anticipating a purpose on the part of the New York union managers, now promoting the local effort, to secure a similar exclusive, boycotting, arrangement with the Baltimore employers. That form of agreement has not been demanded of these employers, and it is not the only form used in the trade elsewhere. Less exclusive forms agreed upon elsewhere have been introduced in evidence. And the union managers, in asking for interviews with the appellee employers, denied any intention to demand an adoption of the New York agreement here, and added that in an interview

they would show the employers how they, the employers, could be secured against any demand for a similar agreement. On this state of facts, the court is of opinion that, however unlawful it might be to attempt to force the employers to adopt such an agreement, the fact could not serve in this case to characterize the strike as unlawful. To give it that effect, the court would have to anticipate an action not now taken and expressly repudiated as within the purpose and intention of the defendants. And an injunction cannot be so founded on supposition. See *Pope v. Clark,* 122 Md. 1, 10; *Levenson & Zenitz v. Bonaparte,* 131 Md. 635, 641; *Hamilton Corp. v. Julian,* 130 Md. 597, 601. We need not decide whether the attempt would render this strike unlawful in purpose.

Expressions of unlawful purposes are thought to be found in the letters written by Shiplacoff asking for interviews with the employers. In his first letter he said, "If for any reason you refuse to have a conference with me, I will think none the worse of you except that it will make it so much harder for me to go on with the organization work and for you to retain the whole-hearted loyalty of your workers." In the other letters, arguing against the refusal of interviews, and continuance of the strike, he cited the fact that the turnover of labor, which would result from continued efforts to get workers into the union, would make the business unprofitable, and referred to a firm in this trade in New Jersey, which, after having been in business thirty years, was compelled to go out of business after the union had continued a strike for fourteen months. Read as a whole, the letters appear conciliatory in tone, carefully made so, in fact, and the threats appear to be, not statements of purposes, but rather of consequences to the employers which might naturally follow from their opposing any attempt to organize the shops, or ignoring any such attempt, and they are right or wrong only as the particular attempt is right or wrong. We do not see that they can be held to characterize the whole attempt here as unlawful in its purpose. Other incidents of the attempt raise questions of right or wrong in the management or conduct of the strike rather than in the purpose of it. And any ground

for interposition by the court is to be found in that management or conduct.

In the case of *My Maryland Lodge v. Adt,* 100 Md. 238, 249, this court stated the general principles which must guide its decision here. "The law protects him (the employer) in his right to employ whom he pleases, at prices which he and his employees can agree upon, and he has the further right to discharge them at the expiration of their term of service, or for violation of their contract. * * * On the other hand the employees have a perfect legal right to fix a price upon their labor, and to refuse to work unless that price is obtained. They have that right both as individuals, and in combination. They may organize to improve their condition, and to secure better wages. They may even use persuasion to have others join their organization. They have an unquestionable right to present their cause to the public in newspapers or circulars in a peaceable way, but with no attempt at coercion. If ruin to the employer results from their peaceable assertion of these rights, it is a damage without remedy. But the law does not permit either employer or employee to use force, violence, threats of force or threats of violence intimidation or coercion." And from these principles it results that in the present conflict the employers are to be protected in the exercise of the rights on their side so far as they consider it to their interest to assert them under all the circumstances, and the employees are to be protected in the assertion of the rights on their side, so far as they desire to do so. So long as the employees avoid the use of intimidation or coercion, other than persuasion, the employees are as much entitled to stand on their rights, and to promote purposes within those rights by peaceable means, as the employers are on their side. The conflict of rights must be settled by the parties themselves, as best they may; the law can be appealed to only to prevent resort to intimidation and coercion which would curtail the rights of one side or the other in the contest. The employees have a right to organize, as has been said, either upon their own initiative or upon the initiative of an existing union of

outside workers. And in the prosecution of their effort to do so, they may quit work and strike, and persuade others to join them in it. The persuasion, so long as it is peaceful and not attended with intimidation interfering with the decision of remaining workers of their free will, may be carried on by pickets outside the places of employment. Difficulty arises, of course, in drawing a line between coercion and mere persuasion. And the zeal of pickets is always likely to carry them too far, whatever the line. Many pickets might merely by their numbers and crowding give rise to some coercion, and possibly single pickets might carry urging to such a point that the annoyance would amount to coercion. The court, upon a showing of excesses being committed in particular cases, can adapt its orders to the particular needs shown.

Here the chief complaint is of excesses committed by the pickets and other strikers in efforts to secure recruits from those still working. The Circuit Court concluded that the picketing as conducted up to the time of the trial was, "in view of the facts and circumstances of the case, unlawful." And the final injunctions against picketing are broadly stated, as has been said. If this means that picketing should be discontinued altogether, it would be, in our opinion, an erroneous conclusion. The strike being lawful in purpose, pickets may be used within reasonable limits to persuade workers to join in the movement. And we do not find from the evidence such conditions as would render it impracticable to permit picketing within reasonable limits. The placarding of the pickets, if it is required by the police department, could not be charged against the strikers as a wrong, if pickets may be maintained at all. And as a means of presenting the cause to the public, held to be a proper measure in *My Maryland Lodge v. Adt, supra,* we cannot hold that the peaceable parading of a reasonable number of men on the sidewalks below the places of business, with the placards described, exceeds the limits of proper promotion of the rights of the striking employees. But if it is true, as testified, that the picketing has been so carried on that girl

employees have hesitated, out of fear, to go on the street, and that the zeal of the strikers in some instances has caused fear of bodily harm to employees remaining at work, then these facts showed excesses which should be restrained. And any insinuating of men to cut the goods in the factory would, of course, be a clear excess and wrong, demanding restraint.

As has been said, the injunctions actually issued cannot be regarded, certainly on their faces, as restraining the acts by employees here held lawful. But that part of the injunction which restrains unlawfully assembling or parading on the streets carrying placards designed to create public prejudice against the plaintiffs for the purpose of threatening, intimidating, or coercing the employees or for the purpose of preventing by intimidation, coercion, or threats any person from working for the plaintiffs, is so broad and indefinite that opinions might differ too widely on the consistency of specific acts, and well-intentioned pickets might too easily incur the penalty of contempt of court without knowing it, according as the court might or might not apply the injunction. Some of the activities of the defendants have, indeed, been found to violate the preliminary injunctions, and yet, in the opinion of the trial court, to violate them without any intention on the part of the defendants to do so. And it might be difficult for the defendants now, even after the findings of contempt, to determine from the adjudication just what they are forbidden to do, and what, if anything, they may do, in the conduct of the strike. The construction and application of the injunctions being unpredictable, violations could surely be avoided only by abandonment of all picketing and other efforts; and that, we think, cannot be required.

It has unquestionably been customary in the past to draft injunctions in labor disputes in broad comprehensive terms. The effort has been to define generally the ultimate legal rights, and, by thus setting up a barrier against all conceivable excesses, to prevent evasion. And conformity to law is most easily assured by stopping at the embodiment of only the legal rules. But it has been made clear that this prac-

tice is sometimes unfair to defendants. See *Frankfurter & Greene, The Labor Injunction*, 112 ff. The possibilities of injustice seem obvious now. In so far as the injunctions may be so broad that their meaning and content depend upon the unpredictable views of the court in particular applications, they may operate as mere screens for subsequent *ex post facto* injunctions and punishments. They are issued in the first place upon complaint of specific excesses, and it would seem possible under ordinary conditions to fit the orders to the particular needs, and give the defendants a fairer guide. What is feasible may differ with particular cases and we lay down no rigid rule. But in this case we conclude that the injunctions could and should be made more specific in relation to the restraints upon picketing. We do not differ from the trial court in its findings of excesses, and danger of further excesses, but we see no need of restraining them by a blanket injunction which might require the abandonment of all picketing for safety.

The testimony in the record now is insufficient to enable a court to determine what number of pickets would be reasonable in this strike, and what would be proper limits to their activities. Our conclusion is, therefore, that the case should be remanded to the Circuit Court to take what testimony may be necessary for the determination of these questions, and the passage of such decree as may now be appropriate, following the expressions of opinion here given. The injunctions appear to need no other changes, broad as they are at present.

Exceptions were taken to the admission of portions of the evidence subject to exception and subsequent refusal to strike the evidence from the record. The forms of agreement made with some employers elsewhere, and demands made upon some of them by the union, and the arrangement made in advance of the strike for bail to be furnished for arrested strikers, are the subjects of exceptions now pressed. But as there is to be no retrial of the issues to which these facts might be relevant, and the decision is unaffected by this evi-

512

dence even if it was wrongly received by the Circuit Court, there seems to be no reason now for taking up the exceptions further.

> *Appeals from orders dated June 26th, 1929, and July 11th, 1929, of the Circuit Court of Baltimore City, adjudging the defendants in contempt of court be dismissed, and that the decrees, dated May 25th, of said court permanently enjoining the defendants, be and the same are hereby reversed, and case remanded for further proceedings and modifications of the decrees in accordance with this opinion; costs to be divided equally between the parties, appellants and appellees, respectively.*