CARROLL, ET AL. *v.* THE PRESIDENT AND COMMISSIONERS OF PRINCESS ANNE, COUNTY COMMISSIONERS OF SOMERSET COUNTY, ET AL.

[No. 525, September Term, 1966.]

*Decided June 7, 1967.*

The cause was argued before HORNEY, MARBURY, BARNES, McWILLIAMS and FINAN, JJ.

*William Harris Zinman,* with whom was *Eleanor Norton* on the brief, for appellants.

*Alexander G. Jones,* with whom were *Jones & Jones, Thomas S. Simpkins,* and *Simpkins & Simpkins* on the brief, for appellees.

FINAN, J., delivered the opinion of the Court.

This is an appeal by Joseph Carroll, Richard Norton, J. B. Stoner, Connie Lynch, Robert Lyons, William Brailsford, and the National State Rights Party, hereinafter referred to as NSRP, from the temporary order of August 7, 1966, and the interlocutory order of August 30, 1966, rendered by the Circuit Court for Somerset County, chancery division, at the in-

128

stance of the appellees, the President and Commissioners of Princess Anne, the County Commissioners of Somerset County, and Mahlond Price and James E. Lauchner, individually, enjoining each of the appellants individually, as well as the NSRP, from holding rallies or participating in any public demonstrations in Somerset County for a period of ten months. The appellants, thereafter, filed an immediate appeal from the various orders below to this Court.

The appellants, each of whom are members or officers of the NSRP, a white supremacist political organization, held what could be described as a public rally or meeting near the courthouse steps on August 6, 1966, at 7:00 p.m., in the Town of Princess Anne, in Somerset County, for the purpose of publicly advancing the tenets of their cause.

The community, or some members of it, were notified four hours in advance of the proposal to hold this meeting. Upon their arrival, the appellants commenced to hook up a public address system. At this time, the appellants were approached by Captain Paul J. Randall, Troop Commander of the State Police for the Eastern Shore District. One of the appellants, Joseph Carroll, Youth Director of the NSRP, together with J. B. Stoner, attorney for the organization, asked Captain Randall if there was any law prohibiting the appellants from setting up an amplifying device and holding a rally in front of the courthouse on Somerset Street. Captain Randall advised Mr. Carroll that no such law existed. Accordingly, the privilege of holding the rally was extended to the appellants within the ambit of Captain Randall's authority. Captain Randall did request that the speeches omit any mention of two pending rape cases involving Negro defendants and a white victim. Thereafter, the rally was commenced by the playing of a musical tape, capable of being heard for several blocks, to the repeated refrain: "Send the niggers north."

Princess Anne, population 1351 (948 white, 403 Negro) is the county seat of Somerset County, population 19,623 (12,315 white, 7,300 Negro). The county is sparsely settled, the majority of its inhabitants being farmers or watermen. Most of the time it is a tranquil community; however, in 1933 it was the scene of Maryland's last lynching. In 1964 the town was again

the scene of serious racial disturbances during which time there were many demonstrations by students of Maryland State College, located in the town with a predominantly Negro student body of 730. A large detachment of Maryland State Police were called at that time to quell the disturbance and the Troop Commander of the State Police was seriously injured. Concentrated sulphuric acid was indiscriminately thrown at the police. Princess Anne is 40 miles from Cambridge, county seat of Dorchester County, where civil disturbances required the presence of the Maryland National Guard for a period of over a year (1963-64). The appellants, the week previously, had been arrested for causing a race riot in Patterson Park, Baltimore, Maryland, which had been given full TV, radio and press coverage. It was not mere chance which brought the appellants to Princess Anne.

At 7:15 Joseph Carroll opened the rally with the announcement that this was a white rally, designed to carry forward the views of the white people organized to oppose black terror, the Communist conspiracy in the United States, unconstitutional injunctions against good white people, such as the appellants, the Negro power structure, a mongrelization of the races and integration of schools and housing. To prevent mongrelization, Carroll assured his audience that they intended to fight in the courts and in every legal manner through the political organization of the NSRP and that they had taken enough off of the "niggers" and enough off of "Martin Lucifer Coon."

The appellant, Richard Norton, leveled his sights at the school integration program. Under freedom of choice, according to Norton, a community was not forced to integrate its schools if it refused to accept, * * * "LBJ's Judas, thirty pieces of silver." The price of acceptance, continued Norton, would lead to rape and the "sacrifice of white blood" in our schools.

Norton lived up to the promise given Captain Randall that no mention would be made of the two pending rape cases involving Negro defendants and a white woman; however, with some relish he reminded the crowd about the 1933 lynching, saying:

> "In 1933 a nigger grabbed a 75 year old white woman
> in this town and brutally raped her, brutally raped her.

What did they do? Did the people go out and say that nigger was a victim of discrimination and that's why he raped her? No. Let me tell you what happened. I am not advocating this but I am just recounting a bit of history. Three thousand people from this town rose up, took that beast out and hung him. You know what the Baltimore papers said, you know what they said? They called it Eastern Shore barbarism, Eastern Shore barbarism. Now a lot of oldtimers here tonight remember the stickers you all had on your cars and windows, 'I am an Eastern Shore man and damn proud of it.' You folks proud of it?
"(Voices) Yeah, yeah."

On integration of schools, Mr. Norton had this to say:

"The act, this is a political struggle, we're in. It's a struggle for survival. Don't think you have it bad down here with niggers. Really, it's not too bad yet. Come to Baltimore City, see what's happening to schools there. The school superintendent of Baltimore City, the excellent Dr. Brain, three years ago his daughter went to Western High School. A nigger girl took a coke bottle, smashed the bottom out, and gouged that poor child's face. Well, after that Dr. Brain resigned, gone to Portland, Oregon, so his daughter could have plastic surgery. Now these bootlickers and political vermin, some of these preachers will tell you they accept this, this is insanity. Don't accept it. Never accept it. Organize. Fight it. You'll win every single time. You want to fight? Come on, let's hear it. Want to fight?
"(Voices) Yeah, yeah."

On employment, Mr. Stoner stated:

"If we only hire whites and we move the blacks out legally, in accordance with the law, up to New York or some place like that, we won't have niggers down here to mix up with."

Mr. Norton continuing on the theme of their Baltimore rally of the previous week, and the inevitable uprising of the whites, said:

> "Well, let me tell you last Thursday night in Baltimore City, two thousand people stood out there in front of our speakers' platform and said that they didn't like niggers and it certainly shook up the political structure of Baltimore City. They had to go to court to stop him. Now they are going to stop us for awhile.
>
> "We know the feelings of people. We watched them for three years building in this country. This country, according to the Newsweek magazine, is probably heading for mass racial violence—two years, three years, nobody can stop it. We can't stop it, and LBJ can't stop it, niggers can't stop it.
>
> &ast; &ast; &ast;
>
> "We always urge white people to get their gun, always have a gun, know how to use it, always have a good supply of ammunition. I will tell you, friends, you are going to have to use it. It's no use hiding; you can't bury your head in the sand like an ostrich. The problems aren't going to go away. The time is come—you are going to have to stand up and face it. You are going to have to face it.
>
> &ast; &ast; &ast;
>
> "But come on back 7 o'clock tomorrow night. We're going to take it easy tonight—we don't want any heart attacks out there. And tomorrow night I want you people really hollering. No violence, just hollering. We want hollering so loud LBJ is going to hear it. Mayor McKeldin heard it in Baltimore. I understand (sic) pulled him half way out of bed."

The next speaker was the star of the attraction. A self-styled sometime lemon picker from California called the Reverend Connie Lynch whose oratorical harangue in part follows:

> "Everyone of us has sworn to defend the Constitution. That means you. That means myself. We swore to de-

fend it against its enemies, foreign and domestic. You know what every white person in America should have done when that Supreme Court refused to rule in favor of the Constitution? [on school integration] They should have been impeached immediately. They should have been tried, convicted and hanged by—remember, the penalty for treason is death. * * *.

* * *

"Whenever they make demands into our white society, when they say they're going to invade our white communities, we are told we can't do anything about it —they have a right to come into your communities. But they're coming in there non-violently. Reminds me of someone coming to my house, knocking on my door, saying, 'Now look-a-here, I'm coming into your house, but I'm not coming in there violently; I'm coming in with a non-violent manner.' Then when he says, 'Now I see your wife there, non-violently I want your wife. And I see you got a beautiful daughter over here—with no violence, but non-violently I want your daughter.'

"Well, I've got an answer to it tonight. I'm willing now and I'll be willing tomorrow and I'll always be willing to fight. Yes, hell yes, any way it takes to fight to stop this invasion of our white communities. How do you white folks feel about it out there, huh?

"(Applause.)"

The rally lasted approximately an hour and one half.

During the progress of the rally the crowd expanded from about fifty at the beginning to about one hundred and fifty to two hundred persons at the conclusion and about twenty-five percent were Negroes, most of whom stood on the fringe of the crowd. Captain Randall, prior to the beginning of the rally had called in about thirty-five state policemen and during the progress of the rally asked for, and received, about twenty-six additional men.

The Court has had the benefit of listening to the tape recording made at the rally, which was filed as an exhibit in the court

below. Toward the end, Mr. Norton shouted remarks in crescendo and in an hysterical, high-pitched cadence directed the following diatribe to the Negroes standing on the fringe of the crowd:

"Well, we aren't going to scare any more, we aren't going to run any more—last summer, Adam Clayton Powell, the nigger congressman from Harlem, stood up and said, 'we got the white man on the run.' Well, personally this is one white man that's not going to run any more. We're gonna stop, we're gonna fight —and I'll tell you one thing, maybe we'll have to sit down in the middle of the street, we'll bring this whole damn program within one year to a crashing halt. We're going to beat them, we're going to beat them, we're going to beat them. We're going to work together—they haven't got a chance. *I'm going to tell you niggers out there now the best thing you can do is start taking reservations for Africa for you're finished. We don't need you. You're off, you're dead. Get ready to leave this country. Get ready to leave this country. You can leave a lot of ways—you can leave on boat, you can leave running, you can bicycle, or you can leave in a box. This is a white man's country. Princess Anne is a white man's town. This is a white man's county.*" (Emphasis supplied.)

The Court has reviewed the facts of this case in light of *Cox v. Louisiana,* 379 U. S. 536 (1965) ; *Cooper v. Aaron,* 358 U. S. 1 (1958) ; *Beauharnis v. Illinois,* 243 U. S. 250 (1952) ; *Terminiello v. Chicago,* 337 U. S. 1 (1949) *Chaplinsky v. New Hampshire,* 315 U. S. 568 (1942) ; *Cantwell v. Connecticut,* 310 U. S. 296 (1940) ; *Schenck v. United States,* 249 U. S. 47 (1919) ; and *Rockwell v. Morris,* 211 N. Y. S. 2d 25 (App. Div. 1961).

We think the lower court acted in the face of a clear and present danger in issuing the temporary restraining order, dated August 7, 1966, enjoining the appellants from holding rallies, "until the matter can be heard and determined in equity or for a period of ten days from the date hereof," and accordingly

we affirm this action. We shall have more to say about the interlocutory injunction later in this opinion.

To elaborate at length on the cited authorities and their application to the case at bar, would be to write on a page of legal history already crowded. However, comment is necessary.

This Court is well aware that "Freedom of Speech," as guaranteed by the First Amendment of the Constitution of the United States is the cornerstone around which the house of government is built and without which other personal freedoms would atrophy.

However, as Justice Holmes pointed out in *Schenck, supra,* freedom of speech is not an absolute right, citing the example at p. 52 that: "The most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre and causing a panic." He gave us the "clear and present danger" doctrine.

The speeches delivered by the appellants must not be judged as they abstractly read or sound in the sequestered atmosphere of judicial chambers, but with the realization that they were, in the nature of a harangue, delivered in the humidity of a torrid August night from the courthouse steps of a county seat whose people were not strangers to racial violence.

Captain Randall, Corporal Chaffey of the State Police, and Mr. Dashiell, a commissioner of the Town of Princess Anne, all having witnessed previous racial disturbances in Princess Anne and Officer Tenney of the Baltimore County Police testified as to the heightened tension of the crowd as the rally concluded. Colonel Davidson, Chief of Operations of the State Police, testified that at the time of the hearing on the injunction, August 30, 1966, "a very tense atmosphere" still existed.

The Court is aware that these witnesses were members of law enforcement agencies and one a town commissioner and that we cannot let our free institutions be circumscribed by the criterion of a police state, as was said by Justice Black in his dissent in *Feiner v. New York,* 340 U. S. 315 (1951) (dissenting opinion at 340 U. S. 321). The Court also realizes that the State has the duty to provide safeguards for those who wish to publicly air their views. Nor, can the authorities rid themselves of an unpleasant task by the simple expediency of not letting mal-

contents or agitators meet. Yet, the testimony of these men, as to the temper of the community and the imminence of danger, cannot be discounted. They wore the mantle of authority and were charged with the onerous burden of preserving the peace. Theirs was the responsibility of providing protection, not only to those persons who might gather at a rally the following night or thereafter, and to the townspeople of Princess Anne, but to the speakers themselves.

The Maryland State Police have had much experience in recent months with "brinkmanship diplomacy," in handling racial meetings and calculating when the "brink" of peaceable exhortation has been reached. There are countless individuals who stand by ready to castigate when the protectors of the public safety miscalculate.

We must also look at the words of the speeches themselves, the common meaning of the words and the manner in which they were delivered. They do not represent an attempt on the part of those addressing the crowd at intellectual persuasion or an appeal to reason by championing a particular social, religious, racial or political philosophy. These were provocative gut speeches, interlaced with "fighting words," delivered in an inflammatory manner aimed at the raw emotions of the listeners. As Justice Frankfurter said in *Drivers Union v. Meadowmoor Co.*, 312 U. S. 287, 293 (1941) : "But utterance in a context of violence can lose its signficance as an appeal to reason and become part of an instrument of force. Such utterance was not meant to be sheltered by the Constitution."

The instant setting was far more volatile than that found in *Cantwell.* The passages are more inflammatory than those of *Feiner, Chaplinsky* or *Cox.* The "fighting words" more identifiable as such than in *Beauharnais* or *Chaplinsky.*

In the instant case the remarks and epithets hurled directly at the Negroes on the fringe of the crowd were nothing less than an invitation to mutual violence, for which the opportunity was being set up for the following night.

Although the State has the duty to provide safeguards for those who wish to publicly air their views, we do not think this duty extends to providing a protected forum from which

136

persons may taunt with "fighting words" those who otherwise would be law-abiding citizens.

Nor was this a case of prior restraint, as in *Rockwell, supra.* The rally was actually staged, the speakers threw down the gauntlet by way of a challenge, particularly to the Negro segment of the community as to what might be expected the following night; at which rally they promised more of the same —only more vituperative, more vicious.

This is not a case where the speakers were restrained by direct police action. The restraint was not imposed upon the speakers until after the matter was given the disciplined review of the court.

We have stated that we are of the opinion that the court was correct in issuing its temporary order, dated August 7, 1966, restraining the defendants from holding rallies and meetings until the matter could be determined by a court of equity or for a period of ten days from the date of the issuance of the restraining order. However, we think the court erred in making its interlocutory order for a period of ten months. It is apparent that the lower court meant for its injunction to be coextensive with the academic year of Maryland State College, which was due to commence within a few days after the issuance of the interlocutory decree of August 30, 1966, and which would normally end in June of 1967. However, we think that the period of time was unreasonable and that it was arbitrary to assume that a clear and present danger of civil disturbance and riot would persist for ten months.

> *Temporary order of August 7, 1966 affirmed, interlocutory order of August 30, 1966 reversed. Each party to pay their respective costs.*