# HARFORD COUNTY EDUCATION ASSOCIATION ET AL. *v.* BOARD OF EDUCATION OF HARFORD COUNTY

[No. 80, September Term, 1977.]

*Decided December 9, 1977.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, LEVINE, ELDRIDGE and ORTH, JJ.

*John W. Hardwicke,* with whom were *Richard W. Emory, Jr.,* and *Walter S. Levin* on the brief, for appellants.

*F. Ford Loker, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Edwin H. W. Harlan, Jr., State's Attorney for Harford County,* and *Peter C. Cobb, Assistant State's Attorney for Harford County,* on the brief, for appellee.

SMITH, J., delivered the opinion of the Court.

In this case we have before us for the first time a charge that school teachers are in criminal contempt' of one of the courts of this State. The matter arises from the alleged failure of certain teachers to obey the terms of an ex parte injunction issued by a circuit judge in Harford County (Close, J.) as a result of a work stoppage. He found them to be in contempt and levied fines accordingly. We shall affirm his determination.

A strike of public school teachers in Harford County began on Tuesday, May 11, 1976. On the morning of May 12 the Board of Education of Harford County filed a petition in the Circuit Court for Harford County against Harford County Education Association (the Association) and others seeking a declaratory decree "that a strike by the certificated professional teachers of the Board or a concerted withholding of or refusal to perform services by such teachers [was] illegal." It also asked for a permanent injunction restraining the named defendants, "all certificated professional teachers employed by the Board," and others "from engaging in a strike against or concertedly withholding or refusing to perform services for the Board or from calling, directing, inducing, encouraging or ordering any employee of the Board or any other persons to engage in or assist in calling or directing a strike against ... the Board." A permanent injunction was likewise sought against picketing or otherwise delaying or interfering with "the normal operations of the free public schools of Harford County." The petition prayed that, pending final hearing and determination of the issues,

an ex parte injunction might be issued along the lines of the requested permanent injunction.

Named as defendants in the petition were the Association, Margaret Hughes, Eddie L. Robinette, Charles Meese, Helen Davis, Mary P. King, Nathan Moore, Eleanor D. Hammond, Clarence Morey, Anthony Sarcone, Elizabeth Feeney, Everett Sillers, Maryland State Teachers Association, Inc., John F. Burke, Charles H. Wheatley, Robert L. Haugen, and Chet Elder (Elder). Messrs. Burke, Wheatley, and Haugen were all returned non est. No return was made as to Maryland State Teachers Association, Inc. (the State Association). Those three individuals and the State Association are not parties to this proceeding. All of the other named defendants are appellants here. All of the individuals other than Elder were teachers (the Teachers) in Harford County. Miss Hughes and Messrs. Robinette and Meese were sued in their individual capacities and as president, first vice-president, and second vice-president of the Association, respectively. Miss Feeney and Mr. Sillers were sued individually and as representatives of the General Council of the State Association. The remaining individual teacher defendants were sued individually and as members at large of the Association. The Teachers were all members of the board of the Association. Elder was an employee of the State Association assigned to Harford County and employed by the Association as a consultant on leave from the State Association. He was sued individually and as "Field Service Representative" of the State Association. Relative to Elder the trial judge said in his opinion:

> "He testified that his job was one of directing the activities and to provide a more aggressive direction. He was the professional strike leader. He had been involved in the election of the County Executive on behalf of the teachers and in salary requests of the teachers of Harford County for a lengthy period of before and up to and including the teachers' strike."

The chancellor met with counsel for the Board and counsel for the Association on May 12. At 9:33 a.m. on that date an

ex parte injunction was issued. The court's order referred to the fact that the defendants named were "collectively, concertedly and individually participating in" a strike which was interfering "with the normal operation of public schools of Harford County," that there appeared "to be a present danger that immediate, substantial and irreparable injury" would result if such conduct were permitted to continue which would include "intolerable disruption to the lives of some 33,600 school children and their families, the economic waste of operating costs to the County and the taxpaying public, and the disruptions generally affecting the peace, safety, good · order, general welfare, and morals of the community . . . ." It said that "the granting of an Ex Parte Injunction under th[o]se circumstances [would] result in less damage to the Defendants than the failure to grant such an injunction would cause to Plaintiff." It then directed that the named defendants and others, including "all certificated professional teachers employed by the Board," be "enjoined and restrained from engaging in a strike against, or concertedly withholding and refusing to perform services for the Board or from calling, directing, inducing, encouraging or ordering any employee of the Board or any other persons to engage in or assist in calling or directing a strike against or withholding and refusing to perform services for the Board . . . ." The defendants were further ordered to "take whatever affirmative action [was] necessary to bring about a cessation of the strike . . . ." By its terms the order was to expire on May 24 unless a request was made before that day for an extension for a longer period of time. The petition for permanent injunction was set for hearing on May 24 with the proviso "that Defendants m[ight] move for an earlier hearing on not more than two (2) days notice" in accordance with Maryland Rule BB72 b. No such motion was ever made.

Counsel for the Association testified that sometime between 1:30 and 2:30 in the afternoon of May 12 she met with Miss Hughes, the president of the Association, at which time counsel advised of the issuance of the injunction and discussed the matter with Miss Hughes. All of the individual parties here were served on May 13. Elder was served at 5:25

a.m. The last party served appears to have been Mrs. Hammond who appeared at the sheriff's office to accept service at 1:00 p.m. on May 13. The attorney for the Association met with the Association's entire executive board around noon on Thursday, May 13. She testified that she discussed the injunction with them "so that they were fully aware of what it meant, what it said, and what to do."

At about 10:30 a.m. on Friday, May 14, the teachers agreed to return to work. They actually returned to classes the following Monday.

Rule P4 a provides, "Constructive contempt proceedings may be instituted by the court of its own motion . . . ." Rule P4 b 1 provides that if the court determines to cite a defendant for contempt a show cause order shall be issued which "shall state the time and place of hearing, allowing a reasonable time for the preparation of the defense, and shall state the essential facts constituting the contempt charged." Rule P4 d 1 states that in such event the court "may designate the State's attorney or any other member of the bar to prosecute the proceeding."

The docket entries reflect:

> "May 24, 1976 Matter taken up before the Court (Judge Close) on Pltf's Motion for Ex Parte Injunction. Parties appeared. No action taken. Appearance of Susan Russess [sic], Esq. entered (Short) for Deft. (on motion)."

The next docket entry after May 24 was on August 17. It shows the filing of what was called "Statement of Essential Facts Constituting Constructive Contempt and Show Cause Order Pursuant to Rule P4 of The Maryland Rules of Procedure." On that date there were in fact two statements filed by the chancellor who had issued the original temporary restraining order. One concerned only those teachers who are parties here other than those who were officers of the Association. It recited their employment as public school teachers in Harford County, the strike, the issuance of the temporary restraining order, its timely service, and their absence from their assigned duties until the termination of

the strike on May 17, referring specifically to their absence on May 11, 12, 13, and 14. The second statement was directed at the Association, Elder, and Miss Hughes. It, too, recited the strike, the issuance of the temporary restraining order, and its timely service. It referred to the fact that Miss Hughes was absent from her assigned duties as a public school teacher during the same period. It cited statements by Miss Hughes and Elder prior to the issuance of the injunction to the effect that they would ignore any court order; a statement by Miss Hughes after the issuance of the injunction that "the strike will continue"; a publication by the Association which noted the issuance of the injunction and spoke of the importance of contacting nonstrikers, urging them to join the strikers; and a meeting between Elder and the Superintendent of Schools on May 13 at which Elder indicated that he "would call off the strike that afternoon because an economic proposal offered to him was acceptable, but he did not then take the actions necessary to call the strike off after the proposal was withdrawn . . . ." In each instance the parties were directed to show cause on or before September 27 why they should not be adjudged in contempt. The State's Attorney for Harford County "or one of his designated assistants" was appointed prosecutor in accordance with Rule P4 d 1. The orders each further directed that the matter be heard on October 25.

In this instance the trial judge who issued the citation for constructive contempt was not disqualified from presiding at the hearing since Rule P4 d 2 provides that he shall not be disqualified "where such contempt consists of failure to obey an order or judgment in a civil case."

Evidence was adduced at the hearing on the citation for contempt showing, in addition to the facts we have heretofore recited: The service of the ex parte injunction upon the Association, Elder, and each of the Teachers and the absence of each of the Teachers from their schools on May 11, 12, 13, and 14. Elder was quoted as having said prior to the injunction that one would be issued and would be ignored. He acknowledged that he was the individual who "approved the content and the message that would go out in" the publication

of the Association known as "HCEA Powerline." That issued under date of May 13 stated:

> "The injunction has been issued naming all HCEA officers and a few others. This is a temporary injunction. The hearing date for the permanent injunction is set for May 24."

It suggested:

> "[I]t is still important that you contact nonstrikers and urge them to join us."

A newspaper reporter testified that prior to the issuance of the injunction Miss Hughes told him, as reported in the press:

> "I knew the chances we took when we called the strike. If an injunction is filed, it is filed. I am ready to go to jail. . . . The job action will continue as long as it takes."

Subsequent to the issuance of the injunction she issued a press release on behalf of the Association saying:

> "We believe that the injunction issued this morning will not help to solve the problem. We are also determined to achieve our goals and, therefore, the strike will continue."

The record reflects interrogation of Miss Hughes relative to this press release and her explanations:

> "Q  Now, why did you indicate that the strike was going to continue in spite of the injunction?
>
>        \*   \*   \*
>
> "A  Sir, this was Wednesday afternoon, and Mr. Elder had been in continuous contact with Doctor Roberty [(County Superintendent)] and with the County Council, negotiations were coming to a close, and we were so near a settlement that I felt it important that the pressure be kept on the County Council in fact to come to an agreement with the School Board and with us.

"I felt that to say anything else publicly would have possibly taken the pressure off and softened the position of the County Council.

"Q Couldn't you have made no statement at all?

"A Sir, I guess that would have been — that would have been an option. But as spokesperson for the organization, I felt some statement should have been forthcoming from me.

"Q Did you think of that statement at all in terms of being possibly a violation of the injunction or contempt of Court?

"A Not at that time, sir, I didn't.

"Q Why didn't you consider it in that light?

"A Well, sir, I felt at the time that a settlement was so near that in fact we would be back to work within a day after the injunction.

"Q But your statement is saying the strike is going to continue.

"A Sir, as a public relations standpoint and in order to bring a strike to a close, which is in effect what I felt the injunction was asking me to do — end the strike as quickly as possible, I felt the only way to do that was to achieve a settlement.

"Q So that was strictly for public relations to keep the Council under pressure; is that right?

"A That was the prime purpose of it, sir.

"Q The prime purpose? Was there a secondary purpose?

"A No. I didn't have any other purpose when I issued it.

"Q Do you recall Mr. Elder yesterday suggesting that teachers felt that the — the teacher membership felt that the union leadership was in some cases weak and not as aggressive as they would have liked to have seen?

"A Yes.

"Q  Did you feel that way, too?

"A  Yes, sir."

The chancellor held all parties in contempt of court for their disobedience of the ex parte injunction of May 12, 1976. He levied fines of $500 on the Association, $350 on Miss Hughes and Elder, and $200 on the remaining parties. Costs were assessed against the Association.

An appeal was promptly noted to the Court of Special Appeals. We issued the writ of certiorari prior to consideration of the case by that court.

Appellants contend:

1 — The Board of Education "sought and received the ex parte injunction to coerce the County political authorities," hence the ex parte injunction was an "abuse of the injunctive process."

2 — "The terms of the injunction are so unspecific and imprecise that Defendants cannot be punished for contempt."

3 — Entrapment, it being claimed, "Defendants were induced by Plaintiff (a) to strike for the benefit of the total educational program and (b) to continue to strike following issuance of the injunction. This inducement is tantamount to entrapment, and the court below failed to consider this complicity as a defense or to consider it as legal justification."

4 — Good faith, arguing that all of the defendants "acted in good faith to comply with the court's injunction, so that the element of contumacious intent was absent. The court below gave no consideration to this argument, and in its findings of fact the court ignored all evidence concerning it."

5 — Impossibility, stating, "It was not possible under the existing circumstances for Defendants to end the strike or achieve the purpose of the court's injunction in a shorter period of time or in any way other than in fact occurred. Literal and physical compliance with the injunction by Defendants would have unalterably

caused the strike to be continued by others and by the rank and file of the school teachers who ordered the strike in the first place."

6 — Innocence of particular teachers, asserting, "The individual school teacher Defendants took no action constituting contempt following their knowledge of the injunction."

After first discussing the law, we shall consider these contentions seriatim.

### The Law

The Association is an "employee organization" as defined in Maryland Code (1957, 1975 Repl. Vol.) Art. 77, § 160 (a) (1). Section 160 provides, among other things, for the right of public school employees to form employee organizations, the designation of an exclusive representative for employees in a specified unit, negotiations between the employer and the employee organization, a prohibition against strikes, and that enactment of § 160 "shall not be construed so as to make the provisions of the Maryland labor laws contained in Articles 89 and 100 of [the Maryland] Code applicable to public school employment." Subsection ($l$) provides:

"Employee organizations shall be prohibited from calling or directing a strike. If an employee organization designated as exclusive representative shall violate the provisions hereof, its designation as exclusive representative shall be revoked by the public school employer, and said employee organization and any other employee organization which violates any of the provisions hereof, shall be ineligible to be designated as exclusive representative for a period of two (2) years thereafter. If any employee organization violates the provisions hereof, the public school employer shall refrain from making payroll deductions for that organization's dues for a period of one (1) year thereafter."

*Cf. Bennett v. Gravelle,* 323 F. Supp. 203, 208 (D. Md. 1971), stating, "The accepted common law rule as adopted in Maryland and in other jurisdictions is that absent an authorizing statute, a public employee has no right to strike." Prior to the enactment of Chapter 483 of the Acts of 1968 no provision similar to § 160 was to be found among the public general laws of Maryland.

The determination that the parties here were in contempt is appealable under Code (1974) § 12-304 (a) Courts and Judicial Proceedings Article. *Cf. Tyler v. Baltimore County,* 256 Md. 64, 259 A. 2d 307 (1969). Under the common law rule there was no right of appellate review in contempt cases, civil or criminal. *Kelly v. Montebello Park Co.,* 141 Md. 194, 204, 118 A. 600 (1922).

A temporary injunction is issued to maintain the status quo pending a decision as to a justiciable controversy, *Pr. George's Co. v. Md.-Nat'l Cap.,* 269 Md. 202, 214, 306 A. 2d 223 (1973), and *Tyler v. Secretary of State,* 230 Md. 18, 20, 185 A. 2d 385 (1962), or in the face of a clear and present danger. *Carroll v. Princess Anne,* 247 Md. 126, 133, 230 A. 2d 452 (1967), *rev'd on other grounds,* 393 U. S. 175, 89 S. Ct. 347, 21 L.Ed.2d 325 (1968). In fact, Rule BB72 a states that an ex parte injunction "shall not be granted unless it appears from specific facts shown by affidavit, or a verified pleading with or without supporting affidavit or sworn testimony, that immediate, substantial and irreparable injury will result to the applicant before an adversary hearing can be had." Orders such as that issued here "must not determine any right nor necessarily prejudice either party," but are simply intended to suspend action until an opportunity is afforded the defendants to answer and defend. *Thompson Ry. Co. v. Young,* 90 Md. 278, 283, 44 A. 1024 (1899). As Judge Henderson put it for the Court in *Kahl v. Con. Gas, El. Lt. & Power Co.,* 189 Md. 655, 658, 57 A. 2d 331 (1948), "[I]t is fundamental that a preliminary injunction does not issue as a matter of right, but only where it is necessary in order to preserve the *status quo.*"

A party enjoined may not violate the terms of an injunction and then attack the injunction collaterally in a contempt

proceeding, civil or criminal. *Save-Mor Drugs v. Upjohn Co.,* 225 Md. 187, 190, 194, 170 A. 2d 223 (1961). Only a complete lack of jurisdiction in the court to grant the injunction and not merely error in granting it could avail a party. *Id.* at 190. In this instance there is no claim of lack of jurisdiction on the part of the trial court. *See also Donner v. Calvert Distillers Corp.,* 196 Md. 475, 486, 77 A. 2d 305 (1950), to similar effect which referred to the holding of the Supreme Court in *United States v. United Mine Workers of America,* 330 U. S. 258, 67 S. Ct. 677, 91 L. Ed. 884 (1947), and its statement, "The defendants in making their private determination of the law, acted at their peril. Their disobedience is punishable as criminal contempt." A temporary restraining order had been issued in *United Mine Workers.* In *Burton v. Taxicab Co.,* 156 Md. 183, 143 A. 799 (1928), a decree of the Circuit Court No. 2 of Baltimore City enjoined an individual against using and operating in that city a taxicab not so marked as to be easily distinguishable from the Yellow Taxicabs operated by the Taxicab Company. Ultimately, the person enjoined was held to be in contempt by violating the injunction. Chief Judge Bond observed for the Court:

> "[T]here has been no appeal from the decree in this case and it is final and beyond objection. The question now is only one of compliance or failure to comply. *Howat v. Kansas,* 258 U. S. 181, 189 [(1922)]." *Id.* at 184.

In *Wingert v. State,* 132 Md. 243, 249, 103 A. 437 (1918), the Court quoted the opinion of Chancellor Bland in *Williamson v. Carnan,* 1 G. & J. 184 (1829), where he observed:

> "But, if the position assumed by this defendant be correct, then, instead of obeying, or moving to dissolve an injunction, a party may avail himself of various modes of getting around, or under, or over it, without being chargeable with the slightest contempt of the law." *Id.* at 205-06.

A similar concept was expressed for this Court by Chief

Judge Marbury in *Donner,* 196 Md. 475, when he commented relative to an injunction:

> "[I]t must be obeyed until such time as it is stricken out on application, or reversed on appeal, or otherwise ceases to be a vital and subsisting direction of a court with proper jurisdiction over the parties to the case." *Id.* at 489.

Where the terms of an injunction are not specific and definite, a defendant will not be punished for contempt. *Rocks v. Brosius,* 241 Md. 612, 648, 217 A. 2d 531 (1966); and *Wells v. Osborne,* 204 Md. 375, 379, 104 A. 2d 599 (1954). An injunction must be sufficiently specific to give a defendant a fair guide as to that expected of him. *Pocketbook Workers v. Orlove,* 158 Md. 496, 511, 148 A. 826 (1930).

As explained for the Court by Judge W. Mitchell Digges in *Ex Parte Bowles,* 164 Md. 318, 165 A. 169 (1933), a person is held to intend what he does:

> "The appellant contends that he had no intention of committing contempt, and that his denial of that intention in the answer frees him from the responsibility for his act. In such cases one must be held to intend what he does, and the language indicating that intention be construed according to its usual ordinary import. It can never be that one could be guilty of acts which constitute contempt, and subsequently relieve himself by saying that, 'although it was contempt, I did not intend it.' The only legitimate effect of a subsequent denial of intention, if such denial be sincere and *bona fide,* is to mitigate the punishment. 6 *R. C. L.* 534; *Merrimack River Savings Bank v. Clay Center,* 219 U. S. 527, 31 S. Ct. 295, 55 L. Ed. 320; *In re Duncan,* 83 S. C. 186, 65 S. E. 210; *In re S,* 83 N. J. Eq. 607, 91 A. 801. In 13 *C. J.* 45, sec. 61, it is said: 'Disclaimer of intentional disrespect or design to embarrass the due administration of justice is no excuse, especially where the facts constituting the contempt are admitted or where the contempt is clearly apparent

from the circumstances surrounding the commission of the act.' " *Id.* at 333.

In *Maddox v. Maddox,* 174 Md. 470, 474, 199 A. 507 (1938), Judge Parke commented for the Court, "A refusal to obey the order of the court, or a satisfactorily proved subtle defeat of its mandate, is a contempt." *See also Weaver v. State,* 244 Md. 640, 644, 224 A. 2d 684 (1966), citing 17 Am. Jur.2d *Contempt* § 34 (1964). The intent of an individual is important, however, as was pointed out in *Giant of Md. v. State's Attorney,* 274 Md. 158, 176-77, 334 A. 2d 107 (1975). Included with intent is the element of good faith. *See Baltimore v. William E. Koons, Inc.,* 270 Md. 231, 237, 310 A. 2d 813 (1973), and *Wells v. Osborne, supra.*

It must be borne in mind that, as Judge Hammond put it for the Court in *Sheets v. City of Hagerstown,* 204 Md. 113, 118, 102 A. 2d 734 (1954), "A contempt was, at common law, and now is, an offense against the court as an organ of justice." In fact, counsel for the Teachers and the Association hit the nail on the head in argument to the chancellor when he said, "[T]he question is whether or not the majesty of the State of Maryland as represented by [the Circuit Court for Harford County] has been offended by these Defendants."

### 1. Abuse of Injunctive Process

The parties did not appeal pursuant to the provisions of Code (1974, 1977 Cum. Supp.) § 12-303 (c) (1), Courts and Judicial Proceedings Article, from the issuance of the ex parte injunction, nor did they file an answer to the petition for an injunction, made by the statute a necessary prerequisite to such an appeal. Accordingly, under our cases they may not now collaterally attack the propriety of the issuance of the injunction. Moreover, their attempt in their argument on this subject to invoke the provisions of Code (1957) Art. 100, §§ 63-75 (sometimes called "Maryland's Little Norris-LaGuardia Act") is completely without merit because, as we have already pointed out, Art. 77, § 160 (m) specifically provides that the enactment of § 160 "shall not be construed so as to make the provisions of the Maryland labor laws

contained in Articles 89 and 100 . . . applicable to public school employment."

## 2. Vagueness

It is contended "that the injunction is vague in at least two respects. First, it does not prohibit the continuation of negotiations simultaneous with the strike. Secondly, it requires 'that the Defendants take whatever affirmative ᴄ tion is necessary to bring about a cessation of the strike,' which all parties agreed could best be done by negotiations during the continuation of the strike." The term "all parties" can refer to no one other than the appellants because there was not the slightest evidence that the Board of Education of Harford County held any such view.

The court order said that "the concerted withholding and refusal to perform services by such teachers [was] unlawful." It then:

> "ORDERED that the Defendants, and each and every one of them, and all certificated professional teachers employed by the Board . . . are hereby enjoined and restrained from engaging in a strike against, or concertedly withholding and refusing to perform services for the Board or from calling, directing, inducing, encouraging or ordering any employee of the Board or any other persons to engage in or assist in calling or directing a strike against or withholding and refusing to perform services for the Board . . . ."

The next succeeding paragraph:

> "ORDERED that the Defendants, and each and every one of them, and all certificated professional teachers employed by the Board . . . are hereby enjoined and restrained from picketing, or inducing, encouraging, directing, ordering or causing others to picket in close proximity to any public school property or any other location where such picketing would have the effect of furthering such strike or of hindering, delaying, disturbing, or interfering

with, in any manner and by any means or device, the normal operations of the free public schools of Harford County . . . ."

The fact that the next paragraph directs that they "take whatever affirmative action is necessary to bring about a cessation of the strike" does not, in our opinion, make the preceding paragraphs vague or ambiguous. It does not subject the injunction to misunderstanding by persons of average intelligence. The order was plain. The strike was unlawful. The Teachers were enjoined from engaging in a strike or concertedly withholding and refusing to perform their services for the Board. They were not to picket or induce others to picket in close proximity to a school. This all pertained to their own rendition of services to the Board of Education of Harford County. In addition to ceasing their own strike activities they were directed to take affirmative action to bring about a cessation of the strike. Likewise, Elder was not to encourage any teachers to engage in a strike or to picket. In addition to this, he, too, was directed to take affirmative action to bring about a cessation of the strike. We regard the terms of the injunction as plain.

### 3. Entrapment

This argument revolves around a contention that the Superintendent of Schools was sympathetic with their demands. The chancellor said, "I have nothing in the record before me to indicate to me that [the Superintendent of Schools] said 'Now go and strike and I am in step with you.' " Having carefully reviewed the record in its entirety, we agree. In *Grohman v. State,* 258 Md. 552, 560, 267 A. 2d 193 (1970), this Court, in a matter involving contempt, adopted and applied the principles of the law of entrapment as enunciated by the Court of Special Appeals in *Simmons v. State,* 8 Md. App. 355, 259 A. 2d 814 (1969). Under this theory, two questions of fact arise, (1) whether the agent induced the accused to commit the offense charged; (2) if so, was the accused ready and willing without persuasion and was he awaiting any propitious opportunity to commit the offense. On the first question the accused has the burden; on the

second, the prosecution has it. In this regard it must be noted that the offense here charged is not that of attempting to obtain higher pay for themselves and their fellow teachers nor are they charged with striking prior to the issuance of the injunction, both of which it is alleged were encouraged by the Superintendent of Schools. They are charged with contempt of court for failing to obey the ex parte order which directed a cessation of their strike activities and thus a return to work by the Teachers, which they failed to do. There is not the slightest evidence in this record indicating that the school officials of Harford County suggested to the Teachers that they defy the order of the circuit court for that county or that they attempted in any manner to entice defiance of the injunction. Accordingly, this contention is without merit.

### 4. Good Faith

The Teachers failed to return to work or to otherwise cease their strike activity in obedience to the ex parte injunction. They participated with Elder in a meeting of the executive board of the Association the day after the injunction was issued. It will be recalled that according to the testimony of counsel for the Association at that meeting on Thursday afternoon she thoroughly explained the injunction to them "so that they were fully aware of what it meant, what it said, and what to do." Had the Teachers reported for work at the beginning of the school day on Friday following this explanation on Thursday, their protestations of innocence and good faith might have a little more merit. However, neither they nor Elder took any steps to induce others to return to work or to otherwise end the strike. The fact that they, as testified by Miss Hughes and Elder, believed it would have been useless to urge a cessation of the strike and that they believed the best way to end the strike was to persist in their efforts to extract from the constituted authority of Harford County a settlement on terms satisfactory to them is not evidence of good faith. The chancellor was under no obligation to accept this protestation on their part as evidence that they meant no "offense against the court as an organ of justice," to use the language of Judge Hammond in *Sheets,*

204 Md. at 118, or against the "majesty of the State of Maryland as represented by [the Circuit Court for Harford County]," to use the language of their own counsel.

### 5. Impossibility

The fact that the Teachers and Elder may have believed that "the rank and file of the school teachers who ordered the strike in the first place" would have continued the strike even had the Teachers returned to work themselves, as they were enjoined to do, and had the Teachers and Elder urged a cessation to the strike, as they were enjoined to do, falls far short of showing that it was impossible for them to obey the injunction. This belief in no way prevented their personal obedience to the mandate of the court.

### 6. Innocence of Particular Teachers

It was carefully established that each of the "individual school teacher Defendants" was absent from his or her school duties after the issuance of the injunction. They failed as an executive board, of which they clearly constituted the overwhelming majority, to take any action requesting others to return to work.

The appellants label Friday as a "lock out." It was 10:30 on Friday morning when the union voted to end the strike. There was testimony on the part of certain of the school officials that they were of the view that 10:30 in the morning was a little late in the day for teachers generally to return to work since there were already substitutes on the job. It was believed that such a return at that hour might have had a disrupting effect. There is not an iota of evidence, however, of an attempt on the part of any of the Teachers to return to work on Friday morning.

As we have already indicated, had these Teachers reported for duty at the beginning of the school day on Friday, before the union vote that morning, or otherwise taken steps to end the strike before that vote, their protestations might have more merit.

There is a suggestion that Meese should be absolved of contempt because his absence during a part of the period

involved was said to be on account of a death in his family. However, as the chancellor pointed out, "He was not on leave, nor did he report his need to be absent because of an emergency. He was seen by his Principal once or twice during the strike period near but off of the school grounds." His principal testified in the affirmative to a question as to whether a teacher was required to give notice when he was absent "either preplanned or on the day of the absence." He further testified that no notice was given to him by Meese of any reason or justification for his absence on May 11, 12, 13, or 14. He returned to work on May 17 with the others.

Rule 886 is applicable to the contentions raised under this heading. There was ample evidence to support the finding of the chancellor; he was not obliged, nor is any trier of fact ever obliged, to believe any specific statement.

*Order affirmed; appellant Harford County Education Association to pay the costs.*