597 A.2d 503

**CHESAPEAKE OUTDOOR ENTERPRISES, INC., et al.**

v.

**MAYOR AND CITY COUNCIL OF BALTIMORE.**

No. 1721, Sept. Term, 1990.

Court of Special Appeals of Maryland.

Oct. 30, 1991.

56

Walter E. Diercks (Eric M. Rubin, Steven J. Stone, Rubin, Winston, Diercks & Harris, Washington, D.C., Emanuel Horn and Horn & Bennett, P.A., Baltimore, on the brief), for appellants.

Sandra R. Gutman (Neal M. Janey, City Sol., Ambrose T. Hartman, Deputy City Sol., on the brief), Baltimore, for appellee.

Argued before WILNER, C.J., and ROSALYN B. BELL and HARRELL, JJ.

HARRELL, Judge.

Appellants, Chesapeake Outdoor Enterprises, Inc. and Boisclair Advertising, Inc. (hereinafter collectively referred to as "Boisclair"), appeal from decisions of the Circuit Cour.

for Baltimore City (Kaplan, J.) dismissing several of their claims against appellee, the Mayor and City Council of Baltimore City (hereinafter "the City"), and then disposing of the rest by summary judgment.

### Facts

This case centers in large part on the provisions of Baltimore, Md., Code art. 30 (1990) (hereinafter "the Zoning Ordinance"), which contains the City's zoning regulations. More specifically, it centers on provisions of the Zoning Ordinance pertaining to general advertising signs. General advertising signs are essentially billboards or outdoor advertising signs that advertise something sold, offered, or conducted elsewhere than on the premises upon which the sign is located. See Zoning Ordinance § 13.0–2.79.[1] Boisclair owns a large number of such signs throughout Baltimore City,[2] having purchased them from other outdoor advertising companies in July 1987 and April 1989. The Zoning Ordinance prohibits such signs in residential, office-residential, B–1 and M–1 zoning districts. Id. §§ 10.0–2, 10.0–3. It allows such signs in B–2, B–3, B–4, B–5, M–2 and M–3 zoning districts as conditional uses, that is, subject to the issuance of a conditional use permit by the City Board of Municipal and Zoning Appeals. Id. § 10.0–3c.

Due to several of the issues raised by Boisclair in its appeal, the history of the City's regulation of general advertising signs is also pertinent here. Prior to the City's initial adoption of a zoning ordinance in 1923, building permits had been required for some time for all construction within Baltimore City. See Baltimore, Md., Code, Ordinance 155

---

1. Zoning Ordinance § 13.0–2.79 specifically defines a "general advertising sign" as follows:
 A sign which directs attention to a business, commodity, service, event, or other activity which is sold, offered or conducted elsewhere than on the premises upon which the sign is located, or to which it is affixed, and which is sold, offered or conducted on such premises only incidentally if at all.

2. Boisclair states in its brief that it owns some 1,300 signs throughout Baltimore City with a combined market value of over $2.5 million.

(1908). The City's prohibition of general advertising-type signs in residential zoning districts dates at least as far back as 1925. *Id.*, Ordinance 1247 (1925).[3] With respect to such signs in office-residential zoning districts, the prohibition dates back no later than to 1950, and with respect to such signs in B–1 and M–1 districts, to 1971. *Id.*, Ordinance 711 (1953); Ordinance 1051 (1971). In 1950, the City adopted an amortization provision[4] directing removal of all nonconforming signs[5] in residential and office-residential zoning districts within five years. *Id.*, Ordinance 1101 (1950). In 1971, this provision was recodified and its effect extended to B–1 and M–1 zoning districts of Baltimore City. *Id.*, Ordinance 1051 (1971). Thus, facially, even nonconforming general advertising signs have not been permitted in residential zoning districts since 1955, or in office-residential, B–1 or M–1 zoning districts since 1976.

In September 1989, the City issued to Boisclair several notices informing Boisclair that many of its signs were in violation of the Zoning Ordinance and ordering it to correct the following violations:

1. Numerous General Advertising Signs erected and maintained in various locations in Residence Districts and B–1 Business Districts and M–1 Industrial Districts

---

**3.** The City's initial zoning ordinance stated that no "residence district" could include "any building or use not located on the same lot with the building or use to which it is accessory," nor any "large signs." Baltimore, Md., Code, Ordinance 922 (1923). It was recodified in 1925 to make explicit that outdoor advertising signs which did not pertain to the property to which they were affixed were prohibited in residential zoning districts. *Id.*, Ordinance 1247 (1925).

**4.** An amortization provision essentially provides a grace period in which a zoning regulation will not be enforced, "during which time a property user either can make a use conform to the [regulation], or if a user cannot or chooses not to conform, during which a user can recover all or part of his investment before the use must be discontinued." *Georgia Outdoor Advertising, Inc. v. City of Waynesville,* 900 F.2d 783, 785 (4th Cir.1990).

**5.** A nonconforming sign is one which was lawfully erected prior to the adoption of the regulation prohibiting it. *See infra,* our discussion in issue III.

throughout Baltimore City. REMOVE WITHIN 10 DAYS[;]

2. Numerous General Advertising signs erected and maintained without permits in B–2; B–3; B–4; & B–5 Business Districts and M–2 and M–3 Industrial Districts throughout Baltimore City. REMOVE WITHIN 10 DAYS. OBTAIN PERMITS BEFORE REINSTALLING.

After receiving these notices, Boisclair initiated negotiations with the City's Mayor, the Honorable Kurt L. Schmoke, regarding the fate of its signs. The negotiations ultimately resulted in a written "memorandum of understandings" (hereinafter "Memorandum") being executed by Mayor Schmoke and James A. Eatrides, President of Boisclair, on 24 November 1989. Among other things, the Memorandum provided for immediate removal of alcohol and tobacco advertising copy from Boisclair's signs that were located in close proximity to school and church buildings in Baltimore City, gradual withdrawal of some 400 of Boisclair's signs from residential zoning districts, reduction of the percentage of its advertising copy devoted to alcohol and tobacco products, and the establishment of a task force to study and formulate recommendations for amendments to the Zoning Ordinance to provide for a "coherent and efficient" means of regulating general advertising-type signs. The Memorandum also provided that both parties would refrain from bringing actions against one another so long as both continued to abide by its provisions.

In early 1990, City Council members apparently expressed their dissatisfaction with this state of affairs and with their noninvolvement in the negotiations that led to the execution of the Memorandum. Shortly thereafter, in spite of Boisclair's compliance with the terms of the Memorandum, the City notified Boisclair that it intended to repudiate the agreement. On 8 May 1990, the City initiated a suit against Boisclair in the Circuit Court for Baltimore City, seeking an injunction requiring the removal of the offending signs. Four days later, Boisclair filed a suit against the City, alleging: (1) breach of contract due to the repudiation

of the Memorandum (count I); (2) tortious interference with its contracts with third parties (count II); (3) violation of its constitutional due process rights (count IV);[6] (4) violation of its constitutional right not to be deprived of its property without just compensation (count V); and (5), violation of its right to just compensation for the deprivation of its property under Md.Code Ann. art. 25, § 122E (1990) (count VI). The cases were consolidated on 30 August 1990.

On 6 September 1990, the City's motion to dismiss Boisclair's complaint was granted by the circuit court as to Counts I, IV and VI. The City subsequently filed a motion for summary judgment on the remaining counts. The circuit court granted this motion at a hearing on 24 October 1990 and immediately ordered the removal of the offending signs.[7]

We will elaborate on the facts of this case as necessary in our discussion of the individual issues presented.

Boisclair now presents the following issues for our consideration:

I. Whether the circuit court erred in dismissing Count I of Boisclair's complaint on the ground that the Memorandum was not enforceable because it was not endorsed by the City Solicitor;

II. Whether the circuit court erred in dismissing Count VI of Boisclair's complaint on the ground that Md.Code Ann. art. 25, § 122E does not apply to the City;

III. Whether the circuit court erred in granting summary judgment for the City on Count V of Boisclair's complaint on the ground that there was no genuine dispute as to the fact that none of Boisclair's signs were legally erected or maintained; and,

---

6. Due to a typographical error, Boisclair's complaint did not contain a count III.

7. Boisclair's motion to stay the circuit court's order (hereinafter "the Order") pending appeal was granted by this Court on 21 November 1990.

IV. Whether the circuit court's Order violates Md.Rule BB78 (1991)?

## I.

■ Count I of Boisclair's complaint alleged that the City's repudiation of the Memorandum constituted a breach of contract. The circuit court dismissed this claim on the basis of Baltimore City Charter art. VII, § 27 (1990), which provides as follows:

All deeds, bonds, contracts, releases, and other legal instruments involving the interests of the City or to be executed and approved by the Mayor or other officer of the City before they are executed or accepted, shall be submitted to the City Solicitor and have endorsed upon them his opinion as to their sufficiency and their compliance in terms and conditions with the laws or ordinances under which they are executed.

The circuit court concluded that under this provision the Memorandum was invalid, as it did not contain the endorsement of the City Solicitor. Boisclair contends that the Memorandum is valid without the endorsement of the City Solicitor. We are inclined to disagree with Boisclair.[8] We

---

**8.** Boisclair presents a number of arguments in support of its contention that the Memorandum is valid without the endorsement of the City Solicitor. Boisclair first argues that on its face § 27 applies only to "formalistic transactional instruments where compliance with technical legal form may subsequently prove to be important," rather than "administrative agreements" such as the Memorandum. This argument seems self-contradictory, as Boisclair's claim is based on the notion that the Memorandum is itself a "formalistic transactional instrument," namely a contract. Boisclair's second argument, that the language of § 27 is not mandatory, is contradicted by the plain language of that provision. Boisclair's next assertion is that it is common practice for the Mayor to enter into agreements such as that embodied in the Memorandum without the endorsement of the City Solicitor. Even if this were true, however, it would not alter the plain language of § 27 or allow this Court to ignore that language.

Boisclair's final argument relies principally upon *Cohen v. Baltimore County,* 229 Md. 519, 185 A.2d 185 (1962). In that case, the Court of Appeals held that a Baltimore County Charter provision stating that "the County executive shall sign on the County's behalf all

need not consider Boisclair's arguments on this issue, however, since there is a more fundamental problem with Boisclair's breach of contract claim, and since we are not confined to the reasons given by the circuit court in affirming its decision. *See* Md.Rule 8–131(b); *Neville v. State,* 290 Md. 364, 430 A.2d 570 (1981).

It is well established that "if a public corporation enters into a contract that barters away or otherwise restricts the exercise of its legislative or police powers, then the contract is ultra vires and void ab initio." *Dept. of Public Serv. v. Mass. Mun. Elec.,* 151 Vt. 73, 558 A.2d 215, 220 (1988). *See also Attman v. Mayor of Annapolis,* 314 Md. 675, 685, 552 A.2d 1277 (1989) ("a municipality may not contract away the exercise of its zoning powers"). An agreement that purports to contract away the City's ability to enforce its own laws clearly violates this rule.

Contrary to Boisclair's suggestion, the agreement in the case *sub judice* is distinguishable from the settlement agreements typically used in code violation cases. In the latter there is typically a genuine dispute as to whether the code sought to be applied is applicable to the specific facts involved, and this dispute is recited in the agreement as the basis for compromising the dispute. Here, there is no apparent genuine dispute as to the application of the Zoning

---

deeds, contracts and other instruments" did not prevent a municipal contract lacking the required signature from being enforceable. The Court acknowledged the general rule that if a formal mode or method of making a municipal contract is prescribed by charter or statute, use of that method is required to make a binding contract. It ruled, however, that the provision in question, rather than prescribing a formal method of making a contract, simply described a required "ministerial function." *Cohen,* 229 Md. at 524, 185 A.2d 185.

Boisclair maintains that the endorsement requirement contained in § 27 is equivalent to the signature requirement at issue in *Cohen.* We see a significant distinction between the two, however. The purpose of the endorsement requirement is to obtain a trained legal opinion on legal instruments involving the interests of the City that are to be executed or approved by City officials who may not have legal training. Such a function clearly requires the exercise of judgment and discretion, and we would be reluctant to characterize it as merely "ministerial."

Ordinance to Boisclair's signs. Thus, the Memorandum is void, and Boisclair's breach of contract claim must fail.

## II.

Boisclair's next argument is that the circuit court erred in granting the City's motion to dismiss Count VI of Boisclair's complaint on the ground that Md.Code Ann. art. 25, § 122E (1990) does not apply to the City. Section 122E provides, in pertinent part, as follows:

> (b) A county or municipality shall pay the fair market value of an outdoor advertising sign, removed or required to be removed by the county or municipality, that was lawfully erected and maintained under any State, county, or municipal law or ordinance.

The circuit court did not further expound upon the reasons for its ruling. In support of the circuit court's decision, however, the City points out that article 25 is entitled "County Commissioners," and that it generally sets forth the powers delegated by the General Assembly to counties governed by county commissioners. The City asserts that § 122E, which is contained within article 25, should accordingly be construed to apply only to counties governed by county commissioners, and not to the City, which has adopted a charter form of government. *City of Baltimore v. Sitnick & Firey*, 254 Md. 303, 255 A.2d 376 (1969).[9] We disagree, for reasons we will explain.

We are faced here with an issue of statutory construction.

> The fundamental task, in such a case, is to discern the objective, goal or purpose of the legislation. In our 'efforts to discover purpose, aim, or policy we look at the words of the statute . . . because what the legislature has

---

9. Baltimore City is of course an incorporated city and not a county. Md.Code Ann. art. 1, § 14(a), however, provides that the word "county" is to be construed to include Baltimore City "unless such construction would be unreasonable." In any case, § 122E explicitly applies to both counties *and* municipalities.

written in an effort to achieve a goal is a natural ingredient of analysis to determine that goal.' We also may consider 'other material that fairly bears on the fundamental issue of legislative purpose or goal' so that we may read the language of the legislation in the context within which it was written.

*City of College Park v. Cotter,* 309 Md. 573, 587–88, 525 A.2d 1059 (1987), *quoting Kaczorowski v. Mayor and City Council of Baltimore,* 309 Md. 505, 525 A.2d 628 (1987). By its terms, § 122E applies generically to any "county or municipality." As Baltimore City is a municipality (and is sometimes treated as county, n. 9, *supra*), § 122E would clearly seem to be applicable. The meaning of the words used in § 122E is, however, controlled to some degree by the context in which the words appear. *Kaczorowski,* 309 Md. at 514, 525 A.2d 628. Section 122E is codified in article 25, which, as the City points out, is largely concerned with the political subdivisions of the State governed by county commissioners: hence the title, "County Commissioners." But nothing in article 25, other than perhaps the title, suggests that its application is limited to counties governed by county commissioners. On the contrary, many of its provisions, including § 122E, refer generically to *any* county or municipality, and a number refer explicitly to the City. *See, e.g.,* §§ 26A, 227, 228, 51A, 169, 229. Nor is there any suggestion elsewhere in the Code that the application of the provisions of article 25 is limited to counties governed by county commissioners. Article 25A, § 4 of the Maryland Annotated Code provides that counties with charter forms of government (including the City, *see supra* n. 3) shall exercise the powers set forth in that article as a substitute for the powers codified in article 25. Article 25, however, imposes duties as well as grants powers. *See City of Bowie v. County Commissioners,* 258 Md. 454, 267 A.2d 172 (1970). Article 25A does not state that its provisions should be deemed to substitute for the *duties* imposed by Article 25.

Aspects of the legislative history of § 122E also suggest that the General Assembly intended it to apply to the City. In 1982, Attorney General Stephen H. Sachs wrote to Governor Harry Hughes regarding § 122E's precursor in the General Assembly, Senate Bill 702, that:

[Although] this bill places new law in [Article] 25, County Commissioners, the evident intent is that the bill apply to all the subdivisions of the State.

In the absence of the reference to 'municipalities,' it might be argued that the term 'county' refers only to counties without home rule. However, the fact that the bill expressly applies to the State's municipalities and the title refers to 'any' county, clearly suggests an intent that the bill apply to all counties, including the City of Baltimore.[10]

In vetoing Senate Bill 702, Governor Hughes noted that by requiring compensation for removal of outdoor signs, it would prohibit the use of amortization ordinances, and that the City had urged him to veto the Bill.

The following year Senate Bill 712, which was ultimately enacted into law and codified as § 122E, was adopted by the State legislature. A fiscal note on the legislation stated that the City had estimated that its passage would increase city expenditures in the following year in the form of payments to sign owners by $150,000. On 15 March 1983, the City presented a statement opposing the legislation to the Senate Constitutional and Public Law Committee. In the statement, John Hicks, the City's Program Manager of the Department of Housing and Community Affairs, asserted that "[the legislation] would require the City to pay fair

---

**10.** There are several differences between the language of Senate Bill 702 and § 122E that are not relevant here. After Senate Bill 712, which ultimately became § 122E, was passed by the General Assembly in 1983, Attorney General Sachs wrote Governor Hughes as follows: Last year ... this office concluded that the 1982 bill requiring compensation for the removal of outdoor advertising signs applied to all counties and municipalities. In approving the 1983 bill, we similarly conclude that it applies to all counties and municipalities ...

market value for the removal of billboards, placing an unnecessary burden on taxpayers." Plainly, these remarks indicate that those involved in the legislative process surrounding the enactment of § 122E into law believed that it would indeed apply to Baltimore City.

From the foregoing evidence, it is clear that § 122E was intended to apply to all counties as well as to all municipalities, including Baltimore City, notwithstanding the fact that it is codified in article 25. The circuit court's ruling that § 122E was inapplicable to Baltimore City was, therefore, erroneous. Boisclair was not prejudiced by the circuit court's error, however, since it failed to present any evidence that its signs were "lawfully erected and maintained under any State, county or municipal law or ordinance," as required by § 122E.[11] Accordingly, we need not reverse the circuit court's dismissal of Count VI of Boisclair's complaint. *Harris v. David S. Harris, P.A.*, 310 Md. 310, 529 A.2d 356 (1987).

## III.

Boisclair next challenges the propriety of the circuit court's grant of summary judgment against it on Count IV of Boisclair's complaint.[12] Count IV alleged that the City's removal of Boisclair's signs without payment of just compensation would constitute an unconstitutional taking.[13] In

---

**11.** We discuss Boisclair's failure to present evidence that its signs were lawfully erected and maintained in our discussion of issue III, *infra.*

**12.** The City moved for summary judgment on Counts II and IV of Boisclair's complaint. Count II alleged that the City had tortiously interfered with Boisclair's contracts with third parties by acting to secure the removal of its signs. On appeal Boisclair does not separately address the circuit court's grant of summary judgment on Count II. Instead, it argues that, if the circuit court is found to have erred in granting summary judgment on Count IV, the circuit court's decision on Count II should also be reversed.

**13.** Boisclair's claim was based on Md. Const. art. III, § 40 (1981) and Md.Decl. of Rts. art. 24 (1981). The former provides:

granting the City's motion for summary judgment, the circuit court ruled that there was no real dispute as to the fact that none of Boisclair's signs were lawfully erected or maintained. Accordingly, the removal of the signs could not constitute an unconstitutional taking, and the City was entitled to judgment as a matter of law.

## A.

We begin our analysis with a brief discussion of summary judgment procedure, which allows the disposition of a case without trial when there is no real or genuine factual controversy between the parties. *Harris v. Stefanowicz Corp.*, 26 Md.App. 213, 218, 337 A.2d 455 (1975). When ruling on a motion for summary judgment, a trial court must address two separate issues: whether there is a genuine dispute as to a material fact, and whether the moving party is entitled to judgment as a matter of law. *Castiglione v. Johns Hopkins Hospital*, 69 Md.App. 325, 332, 517 A.2d 786 (1986). One who moves for summary judgment has the burden of demonstrating the absence of any genuine dispute as to a material fact. *Id.* Any doubts must be resolved against the moving party. *Id. See also Washington Homes v. Int'l Land Dev.*, 281 Md. 712, 716, 382 A.2d 555 (1978).

■ In discussing the materials a trial court may properly consider in ruling on a summary judgment motion, we have stated as follows:

The party moving for summary judgment may place before the trial court the facts necessary to a determina-

---

The General Assembly shall enact no Law authorizing private property, to be taken for public use, without just compensation, as agreed upon between the parties, or awarded by a Jury, being first paid or tendered to the party entitled to such compensation. Section 40A provides the same for Baltimore City. Md.Decl. of Rts. art. 24 provides:

That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by judgment of his peers, or by the Law of the land.

tion for summary judgment (1) by affidavit, (2) by deposition, (3) by answers to interrogatories, (4) by admissions of facts, (5) by stipulation or concession, or (6) by pleadings. Pleadings alone may serve as the basis for providing the necessary factual prerequisites only where the '[a]llegations and the response, or lack of response ... establish facts as admitted or deemed to be admitted, for the purpose of the case.'

*Castiglione*, 69 Md.App. at 333, 517 A.2d 786, *quoting Vanhook v. Merchants Mutual Ins. Co.*, 22 Md.App. 22, 26–7, 321 A.2d 540 (1974). *See also Castiglione*, 69 Md. App. at 334–35, 517 A.2d 786 (facts alleged in pleadings are before court as facts for purposes of summary judgment where "one party in its pleadings concedes the existence of the only facts material to a resolution of the summary judgment motion" by either admitting or not contesting them). If the moving party is able to set forth sufficient facts to demonstrate clearly the absence of a genuine dispute as to a material fact, the non-moving party must counter or oppose the motion by demonstrating that there is indeed a genuine dispute as to a material fact. *Lowman v. Consolidated Rail Corp.*, 68 Md.App. 64, 71, 509 A.2d 1239 (1986).

## B.

■ It is unnecessary to explore in depth the law of taking within the context of zoning, or the concept of amortization, as this Court did so recently in *Lone v. Montgomery County*, 85 Md.App. 477, 494–99, 584 A.2d 142 (1991). Before turning to the circuit court's grant of summary judgment in this case, however, we note one important principle that was implicit in the *Lone* decision, though it was discussed only indirectly. In order for a governmental restriction on use of private property to give rise to a taking, the use in question must have been previously legal. *See id.* at 496, 584 A.2d 142 ("An owner of land may establish a '*lawful* nonconforming use' if the evidence conclusively establishes that before and at the time of the

adoption of the original zoning ordinance, he was using substantially all of his tract of land in a then-lawful manner for a use which by a later legislative action became nonpermitted."). (Emphasis added.) [14] In other words, a property owner cannot obtain compensation from the government for the deprivation of a use which was illegal from its inception. The application of this principle to the instant case is clear. If the circuit court correctly determined that there was no real dispute as to the fact that none of Boisclair's signs were lawfully erected or maintained, then it properly granted the City's summary judgment motion. *Cf. Joy v. Anne Arundel County*, 52 Md.App. 653, 659, 451 A.2d 1237 (1982) (where county code imposed, as condition precedent to use of land, issuance of certificate of use, lack of certificate held to provide sufficient factual and legal predicate for grant of summary judgment).

In support of its motion for summary judgment, the City submitted the affidavit of David Tanner, General Superintendent of Zoning Administration and Enforcement for the City, who averred that: (1) Boisclair owned signs located in "Residence, Office Residence, B–1 Business and M–1 Industrial Districts;" (2) Boisclair owned signs located in "B–2, B–3, B–4, B–5 and M–2 and M–3 districts" that were without permits; and (3) the presence of all these signs violated the City's Zoning Ordinance. Also, the City submitted a violation notice issued to Boisclair on 8 September 1989 containing the same factual assertions.

---

**14.** *See also id.* 85 Md.App. at 501, n. 19, 584 A.2d 142 ("we perceive that what was presented and decided as an amortization may well not have been accurate if the properties had not been in 'legal' conformity prior to the enactment of the statutes. If they were not 'legal' we can perceive a difference in a ten-year grace period to terminate an illegal use and a ten-year amortization period to terminate a legal use."); *Harris v. City of Baltimore*, 35 Md.App. 572, 580, 371 A.2d 706 (1977) ("earnest aim and ultimate purpose of zoning was and is to reduce nonconformance to conformance as speedily as possible with due regard to the *legitimate interests* of those concerned"). (Emphasis added.)

In opposition to the City's motion, Boisclair submitted a letter from Neal M. Janey, the City Solicitor, to Claude E. Hitchcock, the former Chairman of the Mayor's Task Force on Outdoor Advertising, and the affidavit of James A. Eatrides, President of Boisclair. Neither Eatrides' affidavit nor Janey's letter contested the fact that Boisclair owned signs located in B–2, B–3, B–4, B–5, M–2 and M–3 zoning districts that were in violation of the Zoning Ordinance because they lacked permits. Indeed, Eatrides explicitly admitted this fact, stating that if Boisclair was required to remove all of its signs in those districts "and to obtain permits prior to reinstallization of such signs in such districts," its business in the City would be ruined. Nor did Boisclair effectively and specifically contest the fact that Boisclair's signs located in residential, office-residential, B–1 and M–1 zoning districts were in violation of the Zoning Ordinance. Janey's letter appears to assume that the latter signs are illegal. Eatrides' affidavit states only that "these signs have been in existence for a number of years prior to their acquisition by [Boisclair]." If this statement was meant to contend that these signs predated the City's 1908 permit requirement, 1925, 1950 and 1971 zoning prohibitions, or the 1950 and 1971 amortization ordinances and were therefore nonconforming uses, it was clearly insufficient to demonstrate that a genuine controversy as to that fact existed. *See Shaffer v. Lohr,* 264 Md. 397, 404, 287 A.2d 42 (1972) (facts proffered in opposition to granting of summary judgment motion must be "detailed and precise").[15]

Instead of contravening the facts proffered by the City, Boisclair's opposition to the City's motion for summary judgment focused on the constitutional reasonableness of the City's actions by describing the economic effects of

---

**15.** Attempting to expand upon Eatrides' statement, Boisclair's counsel argued at the summary judgment hearing that a number of Boisclair's signs might predate the 1971 or the 1950 amortization ordinances. Boisclair's counsel's statements, however, were little more detailed or precise than Eatrides'. *Shaffer,* 264 Md. at 404, 287 A.2d 42.

application of the Zoning Ordinance's mandates to Boisclair. *See Lone,* 85 Md.App. at 501, 584 A.2d 142 (constitutionality of governmental deprivation of property use without just compensation depends on constitutional reasonableness of government's actions). Only a genuine dispute as to a *material* fact, however, will preclude a grant of summary judgment. Md.Rule 2–501(a) (1991). A "material fact" is one that affects the resolution of the case. *King v. Bankerd,* 303 Md. 98, 111, 492 A.2d 608 (1985). As we have stated, no taking claim is raised by governmental termination or restriction of a use of property that was illegal from its inception. And, if no constitutional claim is raised, then the constitutional reasonableness of the City's actions can have no impact on the case.

Boisclair contends that to require it to produce evidence that its signs are now or have ever been legally in existence would "tur[n] the standards for summary judgment upside down and, in effect, shif[t] the burden of proof for summary judgment from the moving party to the non-moving party." To reprise our discussion of summary judgment procedure, the non-moving party has the burden of coming forward with evidence of a genuine dispute as to a material fact, if the moving party has set forth facts sufficient to demonstrate clearly the absence of such a dispute. *Lowman,* 68 Md.App. at 71, 509 A.2d 1239. The burden of proof, however, remains always with the moving party. *See Castiglione,* 69 Md.App. at 332, 517 A.2d 786. Boisclair never came forward with any evidence as to the legality of its signs. We therefore do not see how the circuit court's grant of summary judgment here "turn[ed] the standards for summary judgment upside down[.]"

▓▓ Boisclair also contends that summary disposition of this case was inconsistent with recent decisions of the United States Court of Appeals for the Fourth Circuit

regarding amortization of nonconforming uses.[16] These decisions stand for the proposition that it is often necessary to engage in "ad hoc factual inquiries" in adjudicating taking claims and that summary judgment may therefore be inappropriate in such cases where the relevant facts are not fully developed. *See Georgia Outdoor Advertising, Inc. v. City of Waynesville,* 900 F.2d at 786. Boisclair maintains that, due to the large number of its signs and the allegedly poor state of the City's records, full discovery and plenary action by the circuit court were necessary in order to determine the exact circumstances surrounding the erection and maintenance of each of its signs and, thereby, resolve the issue of their legality. We do not perceive why full discovery and a complete trial on the merits should have been necessary to unearth materials regarding the signs' former or present legality. Boisclair's responsibility was only to produce enough evidence to convince the circuit court that a genuine dispute between the parties actually existed. Boisclair engaged in rather extensive discovery with respect to other issues involved in the case. Surely it had some opportunity to investigate the legal status of its signs.[17] In short, we do not read the Fourth Circuit decisions relied upon by Boisclair to absolve it of the normal responsibility of a non-moving party at the summary judgment stage of a case.

---

**16.** Boisclair relied on *Georgia Outdoor Advertising, Inc. v. City of Waynesville,* 900 F.2d at 783; *Georgia Outdoor Advertising, Inc. v. City of Waynesville,* 833 F.2d 43 (4th Cir.1987) (*"Waynesville I"*); *Naegele Outdoor Advertising, Inc. v. City of Durham,* 844 F.2d 172 (4th Cir. 1988). Addressing the effect of these decisions on this Court, we stated in *Lone,* 85 Md.App. at 494, 584 A.2d 142, that though they are not binding, they may serve as "very persuasive authority."

**17.** We note that the former or present legality of a property use does not strike us as information particularly difficult to discover. Indeed, one would think that Boisclair would have such information relatively close at hand, having purchased the signs no more than four years before. We believe it to be fairly common in commercial transactions of the magnitude involved in Boisclair's 1987 and 1989 purchases, for there to be a pre-settlement investigation and even legal opinions issued as to the legal status of the property being purchased.

■ Boisclair's final contention in support of its argument that the circuit court erred in granting the City's summary judgment motion is that it was deprived of notice and an opportunity to be heard because the City in effect sprung the issue of the signs' legality on it at the summary judgment hearing. We understand this contention to refer only to the signs owned by Boisclair located in the City's residential, office residential, B–1 and M–1 zoning districts, since, as evident from our discussion of the facts in this case, the City has explicitly contended from the outset that Boisclair's signs located in B–2, B–3, B–4, B–5, M–2 and M–3 zoning districts were without conditional use permits, *i.e.,* that their presence was not now, and had never been, lawful. With regard to the former group of signs, we cannot agree with Boisclair's contention. Even assuming that the City never made explicit its argument that Boisclair's signs were not nonconforming uses,[18] Boisclair should have been prepared to address this issue.[19] As we have already stated, a property owner cannot obtain compensation from the government for the deprivation of a use of property which was illegal from its inception. *See supra,* pgs. 70–71. Knowing that it was contesting the City's ability to restrict or terminate its property use without compensation, Boisclair should necessarily have foreseen

---

**18.** The City certainly *suggested* this contention in its memorandum in support of its motion for summary judgment by stating that "[f]rom the beginning of zoning in Baltimore, billboards have been excluded from residential districts, although those already there were permitted to remain as non-conforming uses[,]" and, further, that "[i]n the present case, assuming *arguendo,* that Boisclair's signs could have constituted a lawful non-conforming use, [the amortization period was reasonable.]"

**19.** In an attempt to demonstrate that it was led to believe that the City was contending only that the signs were illegal because the amortization period had expired, Boisclair points our attention to the fact that a majority of the City's written argument in support of its summary judgment motion was based on the contention that its amortization provision was a reasonable exercise of its police power. Yet we know of no case holding that the burden of establishing an essential element of one's claim is excused by an opponent's failure to spend a significant portion of its Brief contesting the existence of that element.

that it would have to produce at least some evidence that its signs were nonconforming, that is, that they were lawfully in existence up until the adoption of the zoning restrictions or amortization ordinances in question.

 We also wish to make clear that summary judgment would still have been proper in this case even if Boisclair had effectively countered the City's assertion that there was no genuine issue as to whether the signs in the City's amortization areas were nonconforming. The Court of Appeals has twice confirmed the constitutional reasonableness of five-year amortization periods for such signs. *Grant v. City of Baltimore*, 212 Md. 301, 129 A.2d 363 (1957); *Donnelly Advertising Corp. v. Mayor and City Council of Baltimore*, 279 Md. 660, 370 A.2d 1127 (1977). The Fourth Circuit cases previously referred to involve four- and five-and-a-half-year amortization periods for such signs. Here, in contrast, due to the passage of time between the end of the amortization period and the City's enforcement of its Zoning Ordinance, sign owners in Baltimore City had an opportunity to amortize their signs over a period of no less than 19 years (and perhaps as long as 41 years). *See Harris v. City of Baltimore*, 35 Md.App. at 581–82, 371 A.2d 706 (court not restricted in determining constitutional reasonableness of amortization provision to consideration of the original amortization period or its later extension, due to the passage of time since the enactment of those provisions). Nor can Boisclair be heard to complain that it has only owned the signs between two and four years. The City cannot be bound by a business group's ill-conceived decision to gamble on nonenforcement of the City's zoning laws. *See Joy v. Anne Arundel County*, 52 Md.App. at 653, 451 A.2d 1237 (delay in enforcing permit provisions is not generally a defense in a zoning enforcement case); *Nat'l Inst. of Health Fed. Credit Union v. Hawk*, 47 Md.App. 189, 201, 422 A.2d 55 (1981) ("estoppel cannot successfully be invoked against municipal authorities based on zoning actions").

As the City, in its motion for summary judgment, placed before the circuit court the facts necessary for a determination for summary judgment, and as Boisclair did not effectively and specifically counter the City's motion by demonstrating that a genuine dispute did exist as to the question of its signs' legality, we hold that the circuit court was not in error when it granted summary judgment for the City.

## IV.

The last issue Boisclair presents for our consideration involves the circuit court's 24 October 1990 Order. Boisclair contends that the Order violates the mandatory provisions of Md.Rule BB78(a), which provides that:

An order granting an injunction shall set forth the reasons for its issuance; shall be specific in terms; and shall describe in reasonable detail, and not by reference to the complaint or other document, the act sought to be required or commanded or restricted or forbidden.

The circuit court's Order provides, in pertinent part, that:

The above consolidated cases, having come on for hearing on the [City's] Motion for Summary Judgment and Motion for Temporary and Permanent Injunction, the Court having reviewed and considered the motions and responses thereto, and counsel having been heard, it is

* * * * * *

ORDERED that:

1. [Boisclair is] enjoined from allowing the continued existence of all illegal general advertising signs that are under [its] domain and/or control;

2. [Boisclair], at [its] own expense, [is] required, within sixty (60) days from the date of this order, to remove all general advertising signs owned by them which are located in the Residence, B–1 and M–1 zoning districts of [Baltimore City];

3. [Boisclair], at [its] own expense, [is] required, within sixty (60) days from the date of this order, to remove all general advertising signs erected and maintained without

permits in the B–2, B–3, B–4, B–5, M–2 and M–3 districts of [Baltimore City].

Initially, we address Boisclair's second and more substantive complaint regarding the Order. Boisclair contends that the Order does not meet the specificity requirements of Rule BB78—that an order granting an injunction be "specific in terms" and "describe in reasonable detail" the acts required of the enjoined party. Boisclair maintains that the Order "creates a problem of interpretation" because the definition of general advertising signs in the Zoning Ordinance overlaps with the definition of business signs.[20] Boisclair offers as an example a sign advertising cigarettes located on a store which sells that brand of cigarettes (presumably along with a multitude of other brands and products). It maintains that in such a case it would have difficulty determining whether a product advertised by one of its signs is sold "only incidentally" on the premises upon which the sign is located, Zoning Ordinance § 13.0–2.79, making the sign a general advertising sign which must be removed, as opposed to a business sign which may be left standing. Boisclair maintains that it is, therefore, in jeopardy of being punished for contempt of court if it interprets the Order incorrectly.

The specificity requirements of Rule BB78(a) were intended to prevent uncertainty and confusion on the part of those faced with injunctive orders and to avoid the possible founding of a contempt citation on a decree too vague to be understood, as well as to facilitate appellate review. *See Schmidt v. Lessard,* 414 U.S. 473, 94 S.Ct. 713, 38 L.Ed.2d

---

**20.** Boisclair's contention focuses specifically on the following language in Zoning Ordinance § 13.0–2.79: "[a] sign which ... is sold, offered or conducted on such premises *only incidentally if at all.*" (Emphasis added.) The Zoning Ordinance defines a business sign as one which "directs attention to a business, commodity, service, event, or other activity which is sold, offered, or conducted on the premises upon which such sign is located, or to which it is affixed." *Id.* § 13.0–2.76.

661 (1974).[21] Consequently, an order granting an injunction should be "sufficiently specific to give a defendant a fair guide as to that expected of him." *Harford County Education Ass'n v. Bd. of Education,* 281 Md. 574, 587, 380 A.2d 1041 (1977). Because what constitutes a "fair guide" may vary, cases tend to be somewhat fact-specific. *Cf. id.* (terms of order ruled plain and not overly vague where defendants were required to "take whatever affirmative action is necessary to bring about a cessation of the strike"); *Joy v. Anne Arundel County,* 52 Md.App. at 653, 451 A.2d 1237 (order requiring a party to restore its land to its original topography, when there is no evidence in the record as to what that topography was and how the party is to comply, is too vague and overbroad to comply with Rule); *Franzen v. Dubinok,* 45 Md.App. 728, 415 A.2d 621 (1980) (order which required defendant "to take such actions as shall be necessary to prevent any future flooding of the Plaintiff's property" held not to comply with Rule). It may accurately be said, however, that an order need not be absolutely comprehensive in order to satisfy the requirements of the Rule; the Rule requires only "reasonable detail." *See Scandia Down Corp. v. Euroquilt, Inc.,* 772 F.2d 1423 (7th Cir.1985), *cert. denied* 475 U.S. 1147, 106 S.Ct. 1801, 90 L.Ed.2d 346 (1986) (while words "colorable imitation" leave something to the imagination, Rule 65(d) does not require "a torrent of words" when such would not provide more guidance).

We do not think the Order is impermissibly vague. It contains specific terms and explicit details that we consider to be a fair guide to Boisclair's responsibilities under the Order. Boisclair's complaint goes more to the drafting of the Zoning Ordinance than to the terms of the Order itself. It is not the role of the circuit court in issuing an order granting injunctive relief to clarify hypothetical shades of

---

**21.** Rule BB78(a) is based upon Fed.R.Civ.P. 65(d), which contains the same provisions. *See* 9 Report of the Committee on Rules 7 (1953). Decisions interpreting Rule 65(d) are therefore helpful guides in interpreting Rule BB78(a).

meaning which the drafters of the regulation did not see fit to address.[22]

■ Finally, we turn to Boisclair's first complaint, that the Order does not state the reasons for its issuance as required by Rule BB78(a). The circuit court explicitly incorporated into its Order the reasons for issuance set forth in its decision made orally at the 24 October 1990 hearing.

Though the Rule explicitly prohibits incorporation by reference as a means of meeting the Rule's specificity requirements for orders granting injunctions, it does not prohibit incorporation by reference as a means of meeting the requirement that the reasons for issuance of such order be stated. We can find no Maryland case law addressing the specific question of whether incorporation by reference of the reasons for issuance of an order granting an injunction complies with Rule BB78(a). There are a number of federal decisions addressing this requirement of the Rule. Although these decisions suggest that an order granting an injunction should itself contain the reasons for its issuance, *see generally* Wright & Miller, Federal Practice and Procedure: Civil § 2955, we can find none that explicitly prohibits incorporation by reference of reasons for issuance. Indeed, one federal Court of Appeals specifically upheld the validity of an order granting an injunction where it incorporated by reference the reasons for issuance stated by the trial court in its oral opinion. *In re DeLorean Motor Co.,* 755 F.2d 1223, 1228 (6th Cir.1985). Moreover, when federal decisions have overturned such an order for failure to state sufficiently the reasons for its issuance, this failure has generally been combined with either a failure of the trial court to meet the Federal Rule's specificity requirements or the failure of the trial court to set forth adequate findings of

---

**22.** While we do not think the Order ambiguous, we note that Maryland courts will resolve any omissions or ambiguities in an order granting an injunction in favor of a person charged with contempt on the basis of that order. *See Rocks v. Brosius,* 241 Md. 612, 217 A.2d 531 (1966) (no punishment for contempt where terms of injunction not specific and definite).

fact and conclusions of law to support a grant of injunctive relief. *Seattle–First Nat'l Bank v. Manges,* 900 F.2d 795, 800 (5th Cir.1990); *Small v. Kiley,* 567 F.2d 163, 164–65 (2nd Cir.1977). In the case *sub judice,* in contrast, the circuit court's oral opinion, without doubt, sets forth sufficient reasons for issuance of the injunction against Boisclair.[23] Nor can we see how Boisclair was prejudiced by the circuit court's incorporation by reference of the reasons for issuing its Order. *See* Wright & Miller, § 2955 (purpose of Federal Rule 65(d) is to assure adequate notice to defendants of the act or acts required of them). As a result, while a simple recitation of the fact that Boisclair's signs were illegally erected and maintained would have been sufficient and perhaps more appropriate, *see id.* ("[e]laborate detail" of reasons for issuance of an injunction is unnecessary; court should be "specific, direct, and to the point"), we do not think that revision of the Order is necessary in order to satisfy the requirements of the Rule. We therefore affirm the judgment of the circuit court in its entirety.

JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANTS.

---

**23.** " '[T]he court is not bound by the strict requirements of traditional equity as developed in private litigation' ... [w]hen a political subdivision seeks injunctive relief against a zoning violation[.]" *Joy v. Anne Arundel County,* 52 Md.App. at 660, 451 A.2d 1237, *quoting State Dep't v. Baltimore County,* 281 Md. 548, 555, 383 A.2d 51 (1977). As a result, a showing of irreparable injury was not necessary in order to grant the City injunctive relief. *Id.*